243 N.J. Super. 263 (1990)
579 A.2d 332
SISTER MARILYN THERESE WELTER AND SISTER CAROLYN THERESE WELTER, PLAINTIFFS-APPELLANTS-CROSS-RESPONDENTS,
v.
SETON HALL UNIVERSITY, A CORPORATION OF THE STATE OF NEW JERSEY, PHILIP R. PHILLIPS, JOHN J. HAMPTON, WILLIAM BONCHER, JACK SHANNON, DEFENDANTS-RESPONDENTS-CROSS-APPELLANTS. and GEORGE TZANNETAKIS, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued February 27, 1990.
Decided August 6, 1990.
*266 Before Judges PRESSLER, LONG and GRUCCIO.
Miriam E. Cahn argued the cause for appellants-cross-respondents (Eichler, Forgosh, Gottilla & Rudnick, attorneys).
Steven Backfisch argued the cause for respondents-cross-appellants Seton Hall University, John J. Hampton and William Boncher (Whipple, Ross & Hirsch, attorneys; Lawrence A. Whipple, Jr., of counsel).
Joseph P. La Sala argued the cause for respondent Jack Shannon (Robinson, Wayne & La Sala, attorneys).
J. Patrick Roche, argued the cause for respondent, Philip R. Phillips.
The opinion of the court was delivered by GRUCCIO, J.A.D.
Plaintiffs Sister Marilyn Therese Welter and Sister Carolyn Therese Welter, identical twin Catholic nuns, appeal from the dismissal of those portions of their complaint against defendants Seton Hall University, a corporation of the State of New Jersey, Philip R. Phillips, John J. Hampton, William Boncher and Jack Shannon, alleging tortious interference with contract, tortious interference with prospective economic advantage, conspiracy, breach of the duty to abide by the terms of the *267 employee manual and wrongful discharge for refusing to perform acts that violated public policy. The individual defendants are professors and administrators of the University. Defendants admit that Seton Hall breached the one-year notice provision in plaintiffs' employment contracts but argue that it was impelled to do so because of its religious belief that it could not employ plaintiffs against the wishes of their religious order.
Defendants cross-appeal from the denial of their motion for summary judgment. They contend that the Free Exercise clause of the United States Constitution prohibits courts from exercising jurisdiction over this religious controversy. Thus, they contend that the judgment awarding plaintiffs each $45,000 on the breach-of-contract claims should be reversed.
Plaintiffs entered the Ursuline Convent of the Sacred Heart in Toledo, Ohio, on February 2, 1953, and a few years later took vows of poverty, chastity, obedience and instruction of youth. In 1967, they received bachelors degrees from Mary Manse College. In 1973, they received masters degrees in education with course work in mathematics from the University of Maine. One year later they received masters degrees in mathematics from the University of Toledo. By the late 1970's, plaintiffs had completed the course work necessary for their Ph.D.'s in instruction and higher education, but had not written their dissertations.
While teaching at Madonna College in Livonia, Michigan, plaintiffs received an indult of transfer to the Felician order.[1] They had become disturbed by changes in the Ursuline order and were drawn to the Felicians because they continued in a lifestyle similar to that previously pursued by the Ursulines. After deciding not to return to Madonna College, plaintiffs sought employment at three Catholic Universities in the East and with a private corporation. Although they were offered *268 jobs with the corporation, they chose to accept Seton Hall's offer. They rejoined the Ursuline order, but were not reinstated as regular members.
Plaintiffs testified that they were interviewed by defendant Phillips, Dean of the Business School, and defendant Shannon, Assistant Dean for Administration. Plaintiffs testified that they told Dean Phillips and Assistant Dean Shannon that they had completed all of their course work for their Ph.D.'s in education. They further testified that they at no time indicated that they would be receiving Ph.D.'s in computer science. At trial, Sister Marilyn identified the curriculum vitae she submitted to Seton Hall. While not part of the record on appeal, she testified that the document represented her as a Ph.D. candidate in math and higher education, not computer science. In Dean Phillips' deposition, which was read into the record, he testified that plaintiffs had represented to him that they would receive Ph.D.'s in computer science within a year. He later testified that he never saw their curricula vitae.
By letters dated August 4, 1980, Dean Phillips offered plaintiffs one-year assistant professor positions. These letters informed plaintiffs that they would be up for tenure review after five semesters of teaching. Plaintiffs accepted the offer of employment by signing and returning the letters. On August 4, 1980, they signed one-year employment contracts specifically incorporating the university statutes, faculty guide and executive memoranda.
During their first year at Seton Hall, plaintiffs co-chaired the Computer Science Department and received glowing evaluations. They returned to the Ursuline motherhouse in the summer where there arose problems with their superiors over whether they had properly sought permission to accept posts with Seton Hall. The deposition testimony of Sister Kathleen Padden, the general superior of the Ursuline order, indicated that plaintiffs had not obtained permission. However, they *269 were not forbidden from working at Seton Hall at that time. Sister Kathleen stated that plaintiffs had led her to believe that they had signed five-year contracts with Seton Hall when in fact they were offered year-to-year contracts. Because of that belief she allowed plaintiffs to continue working at Seton Hall.
During the first half of plaintiffs' second year at Seton Hall, their employment relationship continued to thrive. The problems began, however, during the second half of the year. It appears that at this time a conflict arose between plaintiffs and defendant Hampton, a professor of finance and chairman of the Educational Policies Committee. Over the Christmas break, Dr. Hampton, Assistant Dean Shannon and another professor, Helena Wisnewski, developed a proposal for a masters program in computer science. However, the Computer Science Department, chaired now by Sister Marilyn, chose not to present that proposal to the committee. Sister Marilyn believed that the department lacked adequate faculty to implement the proposal as designed. Instead, the department decided to present another program developed and approved by Sister Marilyn. Dr. Hampton was very critical of this proposal and circulated a memo to the entire business faculty urging them to carefully study it. He maintained that the proposal did not meet the necessary accreditation standards. Sister Marilyn testified that she was never allowed to present the proposal to the Educational Policies Committee chaired by Dr. Hampton.
Dean Phillips testified that around that time he began asking plaintiffs when they would complete their dissertations. He testified that plaintiffs responded very vaguely and said that they "were working on them." As part of its application for accreditation, the business school began preparing a self-study report which required the details of each faculty member's educational and professional background. Dean Phillips testified that he recalled that plaintiffs' written response to requests for their educational background revealed that they were not working on Ph.D.'s in computer science.
*270 Dr. Hampton's deposition testimony, which was made a part of the record, revealed that at this time another professor, Dr. Boncher, began to question plaintiffs' credentials. On May 13, 1982, Dr. Boncher wrote a memo to Dean Phillips and plaintiffs which stated that the self-study report indicated that plaintiffs' "Primary Field of Degree" was computer and information sciences. However, Dr. Boncher indicated that he had spoken to a professor at Toledo University who told him that plaintiffs' Ph.D. studies and masters degrees had been in the field of education, not computer sciences and mathematics. The deposition testimony of Assistant Dean Shannon indicated that he was not alarmed by this information. At the time plaintiffs were pursuing their degrees, very few schools offered computer science degrees and students regularly completed their course-work through the mathematics departments. It was sufficient for him that they were pursuing education degrees with concentrations in mathematics and had completed significant course-work in computer science.
Dean Phillips then removed Sister Carolyn as chairperson of the Computer Science Department and appointed a newcomer to the school. He made Sister Carolyn the director of the microcomputer lab and placed her and Sister Marilyn in charge of assisting faculty in adapting business courses to computers. However, serious conflicts arose between Sister Carolyn and Dr. Hampton over use of the computer lab. Dr. Hampton believed that plaintiffs put many obstacles in his way when he attempted to secure computer time for his students. Sister Carolyn testified that she could not accommodate Dr. Hampton's requests because of electrical work being done in the lab. Each accused the other of attempting to horde lab time to pursue private, profit-making endeavors.
Because of Dr. Hampton's complaints about the lab, its control was transferred to the Division of Research which was headed by him. Dr. Hampton then removed Sister Carolyn as director of the lab and moved both plaintiffs' offices out of the lab. Dr. Shannon directed that the following sign be placed on *271 the lab door: "TO ALL: NO EQUIPMENT OR SOFTWARE IS TO BE TAKEN OUT OF THE LAB BY THE SISTERS WITHOUT MY PERSONAL OK. BOB." He stated that he believed plaintiffs had failed to return equipment they had properly borrowed.
At the beginning of the fall semester of 1982, plaintiffs' third year with Seton Hall, Dean Phillips decided to place plaintiffs on involuntary sabbatical for the spring semester to allow them to pursue their doctoral studies. Assistant Dean Shannon testified that by the spring semester of 1983, plaintiffs had become disruptive and their presence at the University was a problem. He originally planned to offer plaintiffs terminal-year contracts in accordance with the faculty guide. He contacted Brother Benedict LoBalbo, a Marist Brother and administrator at Seton Hall, for his advice and assistance in terminating plaintiffs. Brother LoBalbo then contacted Sister Mary Rose Krupp, one of plaintiffs' superiors and told her of the University's strong feeling that plaintiffs not remain there for another year. He also pointed out that Seton Hall would give plaintiffs their terminal-year contracts if the Ursulines so wished.
Sister Kathleen Padden testified that Seton Hall did not have any influence over her decision to refuse to give plaintiffs permission to remain at Seton Hall another year. However, only a few months earlier Sister Mary Rose Krupp, plaintiffs' area coordinator, had written to plaintiffs and informed them that there was no necessity to resign. Sister Kathleen sent Dean Phillips copies of her March 9, 1983 letters to plaintiffs denying them permission to remain at Seton Hall for the 1983-1984 academic year. On March 13, 1983, Dean Phillips notified plaintiffs that if Sister Kathleen did not grant them permission to remain, their appointment would be terminated on June 30, 1983. Sister Kathleen did not grant plaintiffs permission and they were terminated. Brother LoBalbo and Assistant Dean Shannon continued to be in contact with the Ursuline order for some time.
*272 On May 20, 1983, the Ursuline convent issued the first of three canonical warnings to plaintiffs as part of the process of dismissing them from the order.[2] They were also ordered to return to Toledo to clarify their status with the order. Although aware that such behavior could lead to their dismissal from the order, plaintiffs ignored the canonical warnings and did not return. In January 1984, plaintiffs were informed that they were dismissed from the Ursuline convent.[3] Among the reasons for their dismissal was their failure to obtain permission from their general superior prior to taking positions with Seton Hall. Plaintiffs do not dispute the legality of their dismissal, but rather argue that the "intermeddling" of Seton Hall and the individual defendants "created the impetus for the Ursulines to react."
Seton Hall contends that the trial judge improperly dismissed its motion for summary judgment grounded in the First Amendment. It argues that as a religious institution it was required to honor the Ursulines' refusal to grant plaintiffs permission to remain at the University for the 1983-1984 academic year. Plaintiffs contend that the controversy is essentially secular, not religious, and that the trial judge properly denied the motion.
In denying defendants' motion for summary judgment the trial judge held:
The First Amendment considerations are not present in the instant case and the Court, I am satisfied, is not precluded from sitting on this particular case.
In this particular case there is no action against Seton Hall University by the Roman Catholic Church or its tribunals. It is, in fact, an action of an educational institution acting with respect to removal and termination of its teachers. The issues involved in this case do not constitute, I am satisfied, religious questions.

*273 The defendants in attempting to argue that the firing of the teachers by the University involves a religious controversy because the teachers happened to be nuns and the University is one associated with the Archdiocese of Newark, have incorrectly framed a dispute in terms of challenge to internal church discipline. The plaintiffs do not seek to be re-admitted to the Ursuline Convent. The "discipline" meted out by the church was the respective decrees of dismissal, dated January 24th of 1984, and affirmed by the Sacred Congregation For Religious And Secular Institutes on March 27th of 1984. The termination of plaintiffs by Seton Hall was not a church disciplinary action. Dean Phillips enumerated six reasons for his terminating the employment, none of which involve anything ecclesiastical except, perhaps, one that relates to approval from the Ursuline Convent.
Now, the plaintiffs' claims in this suit sub judice do not relate to their status as nuns; rather, they relate to their employment as teachers and educators of computer science, which is a secular activity. The "religious issue" has been resolved by the decrees of dismissal issued by the Ursuline Convent.
I, therefore, find there is no danger that the State will become involved in an essentially religious controversy and that the First Amendment will be violated. With respect thereto I, therefore, find that this State of New Jersey does have jurisdiction to adjudicate these claims and the motion for summary judgment is hereby denied.
The trial judge's analysis, however, ignores the fact that Seton Hall, as a diocesan college, enjoys a special relationship with the Archbishop of the Newark Archdiocese and the Catholic Church.[4]See The Canon Law Society of America, The Code of Canon Law, cc. 807-814 commentary at 571 (1985). As such, plaintiffs' status as nuns and Seton Hall's status as a Catholic institution lends to their relationship an ecclesiastical quality.
The United States Supreme Court has long held that secular courts may not interfere with a church's religious determinations concerning questions of discipline, faith or ecclesiastical law. See Watson v. Jones, 80 U.S. 679, 681-82, 20 L.Ed. 666, 676 (1872). In Watson, the Court reasoned:
The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the *274 decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations and officers within the general association is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. [80 U.S. at 729, 20 L.Ed. at 676].
Thus, the Court concluded that courts of law must not interfere with decisions made by religious tribunals concerning doctrine, faith or discipline. Ibid.
More recently, the Supreme Court has reaffirmed Watson and has held that no essentially ecclesiastical decision made by a religious body, however arbitrary, may be reversed by a secular court. Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 720, 96 S.Ct. 2372, 2385, 49 L.Ed.2d 151, reh'g den., 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976). In that case, the Court reversed the Illinois Supreme Court's order reinstating a defrocked bishop. The Court found such an action by a church to be purely ecclesiastical. Ibid.
However, in Jones v. Wolf, 443 U.S. 595, 602-604, 99 S.Ct. 3020, 3024-26, 61 L.Ed.2d 775 (1979), the Supreme Court noted that religious institutions are not immune from responsibility under the civil law. In controversies involving property rights outside of the religious realm, courts may review decisions without offending the First Amendment. Ibid. Jones broke from the teaching of Watson insofar as it allowed courts to determine the ownership of church property by examining the relevant documents setting forth such information. The Supreme Court held that the application of "neutral principles of law" allowed a civil court to enquire into the local church's charter, constitution and bylaws to determine whether the larger church body had any interest in the local church property. 443 U.S. at 603-604, 99 S.Ct. at 3025-26. The Court noted that such neutral principles are often applied to "the manner in which churches own property, hire employees, or purchase goods." Id. at 606, 99 S.Ct. at 3027. The Court specifically held that courts need only defer to religious authority in resolving property disputes where an issue of doctrinal controversy is involved. Id. at 605, 99 S.Ct. at 3026.
*275 Recently, the District of Columbia Circuit Court of Appeals decided a case involving issues somewhat similar to those here. In Minker v. Baltimore Annual Conference, 894 F.2d 1354, 1355-1356 (D.C. Cir.1990), a Methodist minister maintained, inter alia, that his church breached its employment contract with him when it failed to appoint him to a different pastoral position as promised. The District Court dismissed his complaint, holding that the First Amendment prohibits courts from tampering with church decisions regarding the promotion of pastors. Minker v. Baltimore Annual Conference, 699 F. Supp. 954, 955 (D.D.C. 1988). The D.C.Circuit reversed, holding that the pastor's contract claim could be resolved without the court's entanglement in ecclesiastical doctrine. 894 F.2d at 1360. The court also noted that, despite the fact that the plaintiff was a minister of the Methodist Church, the church was not "immunize[d] ... from all temporal claims made against it." Ibid. The Circuit Court remanded the case to the District Court with instructions to hear it, but to dismiss it should it turn out that it could not be decided without excessive entanglement in religious policy. Ibid.
The teaching of this line of cases is that secular courts may decide civil disputes between a religious body and its members or its clergy if those disputes involve purely secular issues and can be resolved without entanglement with matters of faith, discipline or doctrine. In such cases, courts are to apply neutral principals of law to the facts presented.
Here, there are many aspects of the relationship between plaintiffs and Seton Hall which appear purely secular. Among these are the fact that the school dealt directly with plaintiffs for over two years and had no relations, contractual or otherwise, with the order to which they belonged. The University sent plaintiffs' paychecks directly to them, not their order. When plaintiffs requested that Seton Hall send their salaries to the Ursulines, it refused. Moreover, there is no mention in plaintiffs' contracts that their continued employment was conditioned *276 upon the granting of permission by their order. Seton Hall's interest in whether plaintiffs had obtained permission from their order to teach there must be fully explored. Indeed, a lack of permission in and of itself should not afford Seton Hall a way out of its contract. It is also significant that plaintiffs taught secular courses and had no religious duties.
Controversies such as this one are not always clear-cut and often need detailed analysis which is inappropriate to summary judgment disposition. Some, however, are more obviously religious disputes. In Elmora Hebrew Center, Inc. v. Fishman, 215 N.J. Super. 589, 522 A.2d 497 (App.Div. 1987), appeal after remand, 239 N.J. Super. 229, 570 A.2d 1297 (App.Div.), certif. granted, ___ N.J. ___ (1990), we affirmed the Chancery Division's refusal to grant a synagogue's request for injunctive relief against its rabbi. The synagogue made many allegations against the rabbi, including that he had not fulfilled his duties as a rabbi to the congregation and had lied in the presence of the Holy Torahs. Id. 215 N.J. Super. at 591, 522 A.2d 497. As such, Judge Petrella found that religious questions permeated all of the issues in the case. Id. at 596, 522 A.2d 497. He accordingly held that the religious disputes, which were inseparably intertwined with all aspects of the complaint, required the Chancery Division to deny plaintiff's request for injunctive relief. Id. at 597, 522 A.2d 497.
Here, it is considerably more difficult to determine which issues are purely religious and which are purely secular as the facts tend to show that the religious issues are inseparably intertwined with the secular issues. Indeed, in order for the trial judge to determine that plaintiffs, who were indisputably members of the clergy, were acting in a purely secular capacity at Seton Hall, she had to make a determination about the requirements of a religious life. Such a determination necessarily intrudes improperly on a matter of church doctrine. Plaintiffs' premature dismissal arose out of a purely religious doctrine: the refusal of a Catholic institution to act contrary to the decision of another Catholic institution. As the Supreme *277 Court stated in Watson, "All who unite themselves to such a body do so with an implied consent to [its] government, and are bound to submit to it." 80 U.S. at 729. 20 L.Ed. at 676.
Justice Brennan pointed out in Presbyterian Church v. Hull Church, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969), that First Amendment values are plainly jeopardized when civil courts attempt to resolve religious controversies in order to adjudicate civil disputes. In such cases, "the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern." Ibid. Given the importance the Supreme Court has attached to the constitutional imperative of keeping ecclesiastical issues out of the secular courts, the very close issue as to whether the present controversy is essentially secular or religious should be resolved in favor of the result which least threatens the freedom of religious bodies to govern themselves.
It would be unjust, however, if a party could be released from its contract merely by fabricating a religious basis for its breach. As Chief Justice Burger noted in Thomas v. Review Board of Indiana Employment Security, 450 U.S. 707, 715, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981), "One can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise clause...." Thomas involved a Jehovah's Witness whose transfer to an armament-producing job offended his religious beliefs. Although the issue in Thomas was substantially different from the one here, we follow the Supreme Court's requirement that the finder of fact determine whether the party claiming protection of the Free Exercise clause possessed an "honest conviction" that his religion required the complained-of action. Id. at 715-716, 101 S.Ct. at 1430-31.
As such, the trial court here should have submitted to the jury the issue of whether Seton Hall honestly possessed the belief that it could not enter into employment contracts with *278 nuns without the permission of their order. In making that determination, the finder of fact must consider whether the premature dismissal of plaintiffs was religiously motivated or whether the University had other nonreligious goals. If Seton Hall's religious belief was honestly held and its actions were truly religiously motivated, the intertwining of religious and secular issues would be so great as to require the court to abstain from hearing the case. However, if the jury finds that Seton Hall's asserted religious belief was not honestly held and that its actions were not principally religiously motivated, it will not be protected by the Free Exercise clause. The jury may then determine all the remaining issues. The judgment awarding plaintiffs damages for Seton Hall's breach of contract is, therefore, reversed.
Plaintiffs contend on appeal that the trial judge erred in dismissing their claims for tortious interference with prospective economic advantage and conspiracy against Seton Hall and the individual defendants (counts five, nine and ten of the complaint). Plaintiffs further argue that the trial judge incorrectly determined that the individual defendants were acting within the scope of their employment and could not be sued in their individual capacities.
Under R. 4:37-2(b), defendants' motion for dismissal at the close of plaintiffs' case should have been denied "if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." The trial judge may not make a determination as to the worth, nature or extent of the evidence, but only as to its existence, viewed in a light most favorable to the party opposing the motion. Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969). These motions are not favored and should not be granted unless the facts are undisputed and the law free from doubt. Hirsch v. Schwartz, 87 N.J. Super. 382, 387, 209 A.2d 635 (App.Div. 1965).
The trial judge correctly recognized that in order for the individual defendants to be held liable for tortious interference *279 with a contract, they must be shown to have actually interfered with the employment relationship between plaintiffs and Seton Hall and to have done so with malice. Raymond v. Cregar, 38 N.J. 472, 480, 185 A.2d 856 (1962); Norwood Easthill Assoc. v. Norwood Easthill Watch, 222 N.J. Super. 378, 536 A.2d 1317 (App.Div. 1988). The trial judge defined malice as the intentional doing of a wrongful act without justification or excuse. She then improperly proceeded to make findings of fact on matters concerning which conflicting evidence had been introduced. The presence or absence of malice is a factual issue which should have been left to the jury.
Had plaintiffs been able to prove that defendants acted in a wrongful and unjustified manner in inducing Seton Hall to breach its contract with them, it follows that they would have shown that defendants interfered with their prospective economic advantage. The breach cost plaintiffs one year's salary and hampered their efforts to obtain employment. As such, the trial judge improperly dismissed plaintiffs' claims for tortious interference with a contract and prospective economic advantage against the individual plaintiffs (count five of the complaint). Because of these same factual disputes, the trial judge's dismissal of plaintiffs' claim based on conspiracy to interfere with a contract and prospective economic rights (count nine of the complaint) was likewise improper.
The trial judge also dismissed count ten of plaintiffs' complaint charging Seton Hall with tortious interference with prospective economic advantage. She held that her determination that none of the University's agents acted with malice required the dismissal of that count. However, as stated above, the trial judge improperly made the factual finding that the individual defendants did not act with malice. As such, the dismissal of count ten of the complaint is also reversed.
Plaintiffs contend that the trial judge improperly dismissed the counts of their complaint which alleged that Seton Hall tortiously breached its duty to follow the procedures set forth *280 in the faculty manual and discharged them in violation of a clear mandate of public policy. They also contend that the judge improperly dismissed their claims for punitive damages. Our review of the record in the light of the applicable law and the arguments presented persuade us that each of these issues is clearly without merit. R. 2:11-3(e)(1)(E).
In sum, the judgment awarding plaintiffs damages is reversed and the case is remanded for trial. The issue of whether Seton Hall honestly possessed a religious belief which impelled it to breach its contract with plaintiffs is a factual one which must be presented to the jury. Special interrogatories should be submitted so that if the jury finds that Seton Hall honestly possessed this religious belief and did not manufacture it to achieve a nonreligious goal, the contract cause of action should be dismissed as it requires an impermissible inquiry into religious doctrine. If, however, the jury determines that Seton Hall did not honestly possess the religious belief that it was forbidden to enter into a contract with plaintiffs without the Ursulines' permission, it may proceed to determine all of the remaining issues.
Reversed and remanded for proceedings consistent herewith.
NOTES
[1] An indult of transfer is a release by one order, here the Ursulines, and an acceptance by another, here the Felicians.
[2] The process of dismissal is governed by the Roman Catholic Code of Canon Law. See 1983 Code cc. 696-697.
[3] At oral argument plaintiffs appeared in religious garb.
[4] The Roman Catholic Church maintains a strict hierarchical order with all priests, nuns and religious directly responsible to their superiors and/or bishop. For a discussion of the heirarchical and congregational forms of church organization, see 66 Am.Jur.2d, Religious Societies, § 3 at 758-759.