608 A.2d 206

SISTER MARILYN THERESE WELTER AND SISTER CAROLYN
THERESE WELTER, PLAINTIFFS–RESPONDENTS, v. SETON
HALL UNIVERSITY, A CORPORATION OF THE STATE OF
NEW JERSEY, PHILIP R. PHILLIPS, JOHN J. HAMPTON,
WILLIAM BONCHER, AND JACK SHANNON, DEFENDANTS–
APPELLANTS, AND GEORGE TZANNETAKIS, DEFENDANT.

Argued October 22, 1991—Decided June 1, 1992.

Steven Backfisch argued the cause for appellants Seton Hall University, John J. Hampton, and William Boncher (*Whipple, Ross & Hirsh*, attorneys, *Lawrence A. Whipple, Jr.*, of counsel).

Joseph P. LaSala argued the cause for appellant Jack Shannon (*Robinson, Wayne & LaSala*, attorneys).

J. Patrick Roche argued the cause for appellant Philip R. Phillips.

*Miriam E. Cahn* argued the cause for respondents (*Eichler, Forgosh, Gottilla & Rudnick,* attorneys).

*William A. Cambria* submitted a brief on behalf of *amicus curiae,* New Jersey Catholic Conference.

The opinion of the court was delivered by

CLIFFORD, J.

Plaintiffs are former nuns who were employed as teachers by defendant Seton Hall University (Seton Hall or the University). The University breached its employment contract when it failed to give plaintiffs terminal-year contracts for the academic year 1983–84. In plaintiffs' action based on that breach, Seton Hall argues that the failure to issue terminal-year contracts "was mandated by Seton Hall's religious beliefs, which, pursuant to the Free Exercise Clause of the First Amendment to the United States Constitution, may not be reviewed by a civil court." The trial court rejected that defense, and plaintiffs prevailed at trial. The Appellate Division reversed, but in doing so held that Seton Hall's free-exercise defense should have been submitted to a jury. Seton Hall appeals that determination and urges this Court to dismiss plaintiffs' complaint and enter judgment for defendants.

We conclude that plaintiffs performed non-ministerial functions for the University (as used in this opinion, and subject to amplification below, see *infra* at 295, 608 *A.*2d at 214, "ministerial" functions are those related to religious doctrine or pastoral activities within an organized religious group), and that the contract governing the dispute does not incorporate Roman Catholic doctrine. We hold that the trial court properly exercised jurisdiction and that judicial resolution of the dispute does not violate the First Amendment. We therefore reverse the Appellate Division judgment and reinstate the Law Division judgment in each plaintiff's favor for $45,000, representing compensatory damages.

I

Plaintiffs, Marilyn and Carolyn Welter, were nuns of the Ursuline Convent of the Sacred Heart, a recognized pontifical

Order of the Roman Catholic Church. Until June 30, 1983, both also held teaching positions with Seton Hall. On that date, the University terminated plaintiffs' employment, purportedly because plaintiffs' superiors in the Ursulines had ordered them to return to the convent in Toledo, Ohio. Seton Hall concedes that it failed to abide by the employment contract's provisions governing termination, and acknowledges that but for the First Amendment issue raised, the contract would control the dispute. Because our disposition of that constitutional claim turns on the reasons for plaintiffs' termination from employment, we summarize the facts, recounted in greater detail by the Appellate Division, 243 *N.J.Super.* 263, 265–72, 579 *A.*2d 332 (1990).

The record discloses that plaintiffs entered the Ursuline Order in 1953 and thereafter took vows of poverty, chastity, obedience, and instruction of youth. They received masters degrees in education from the University of Maine in 1973 and in mathematics from the University of Toledo in 1974. However, neither has completed the dissertation necessary to the award of a Ph.D.

Plaintiffs eventually applied to Seton Hall and other eastern Catholic universities for positions as computer-science instructors. Acting through several of the individual defendants, the University interviewed the Welters and in 1980 offered them both one-year probationary positions as assistant professors in its newly-formed computer-science department. Because the contracts Seton Hall offers to its clerical faculty do not differ from those offered to lay faculty, the contract that plaintiffs signed includes no condition requiring that they obtain the permission of their religious superiors before accepting employment nor any provision relating at all to matters of religion.

The Welters testified that during the employment interview they accurately reported their academic credentials. Several of the individual defendants who conducted that interview, however, insisted that plaintiffs had misrepresented that they were scheduled to receive Ph.D.s in higher education within one year.

Those defendants also claimed that during the interview, plaintiffs represented that they had obtained permission from the Ursulines to seek or accept outside employment.

After two semesters at Seton Hall plaintiffs returned for the summer to the Ursuline motherhouse, where their superiors voiced doubts about whether plaintiffs had properly sought the Order's permission to accept the teaching positions. One of plaintiffs' former superiors testified that the Ursulines had then agreed to allow plaintiffs to continue working at the University because plaintiffs had (falsely) represented to her that they had already signed a five-year contract with Seton Hall and further because of the Ursulines' conviction that they should honor what amounted to a request for personnel by another Catholic institution.

Midway through plaintiffs' second year at Seton Hall friction between plaintiffs and the University's faculty members and administrators arose and continued through the end of the academic year. Several faculty members felt that plaintiffs were underqualified in the field of computer sciences. None of the complaints or criticisms by administrators or fellow-faculty members concerned religious, doctrinal, or spiritual matters, or issues of church polity, *i.e.*, issues of internal church governance. Rather, they arose over a proposed masters-degree program in computer science, plaintiffs' academic credentials, and plaintiffs' progress towards their doctorates.

By the first semester of the Welters' third year of employment the administration had decided to place plaintiffs on involuntary sabbatical leave for the following (spring) semester to allow them to pursue their doctoral studies. However, defendant Shannon, an assistant dean, testified that by the spring semester, plaintiffs' presence at the University had become unacceptably "disruptive." Thus, by the beginning of that semester, Shannon had decided to offer plaintiffs terminal, one-year contracts for their fourth and presumably final year at Seton Hall. According to the employment contract, that action

along with the submission of written notices of termination would have set the stage for termination of the Welters' temporary appointments at Seton Hall. However, although he prepared them, Dean Shannon never sent written notices of termination or offered plaintiffs terminal-year contracts. Instead, before making public the decision to terminate the Welters, Dean Shannon consulted Brother Benedict LoBalbo, a Marist brother and administrator at Seton Hall, for, in Seton Hall's words, "advice and assistance" in terminating plaintiffs.

Brother Benedict testified that he had advised several of the University's administrators to confer with the Ursulines before offering the terminal-year contracts. His basis for that advice was the unique relationship between the "superior and [the] subject" and the common mission of the Ursuline Order and Seton Hall.

The University therefore authorized LoBalbo to confer with the Ursulines, purportedly based on his assessment that because the Ursulines had unselfishly committed two subjects "for the good of the university," considerations of "religious courtesy" required prior consultation with the Order. LoBalbo testified that he had informed the Ursulines that although Seton Hall preferred that plaintiffs not return for the terminal year, the University would respect the Order's wishes. Contrary to his prediction, the Ursulines did not protest plaintiffs' impending discharge. The record discloses no suggestion that Brother Benedict told the Ursulines that failure to renew plaintiffs' employment contracts without first providing them with terminal-year contracts would violate their employment agreement.

In support of their decision to terminate the Welters' appointments without complying with the contract, defendants rely on Canons 601, 665, 671, and 1375 of the Code of Canon Law. See Canon Law Society of America, *Code of Canon Law* (3d ed. 1983). Canon 601 requires "submission of [a cleric's] will to legitimate superiors * * *." *Id.* at 227. Canon 665 section 2

provides that "[m]embers unlawfully absent from the religious house with the intention of withdrawing are to be solicitously sought after by [fellow members of the faith] and aided to return and persevere in their vocation." *Id.* at 253. Canon 671 prohibits clerics from "accepting duties and offices outside the institute without the permission of the legitimate superior." *Id.* at 255. Finally, Canon 1375 provides that clerics and religious institutions that hinder the exercise of ecclesiastical power shall be punished with a "just penalty." *Id.* at 497.

Plaintiffs charge that Seton Hall's citation of the foregoing canon represents nothing more than an attempt "to convert this case into one featuring religious doctrine and controversy," whereas in fact the canons "do not serve as the factual basis for this case" and "should not be allowed to become the civil law of this state." Moreover, they contend that Seton Hall concocted a plan "quickly to dispose of the Sisters Welter" by "collaborating" with the Ursulines to ensure their departure from the University and to circumvent the express requirements of the contract.

In support of that argument plaintiffs emphasize a dispute that predated problems between plaintiffs and Seton Hall. Apparently, the Welters and the Ursulines had disagreed regarding the proper procedures by which plaintiffs would contribute income to the Order. The Ursulines urged the University to forward plaintiffs' paychecks directly to the Ohio motherhouse, but Seton Hall advised plaintiffs to set up their own checking account, into which they should deposit their entire paychecks and from which they could draw living expenses. When questioned at oral argument, Seton Hall's attorney characterized his client's disregard of the Ursulines' wishes as an "administrative blunder."

In March 1983 the Ursulines wrote plaintiffs that they did not have the Order's permission to renew their contracts with Seton Hall for the academic year 1983–84. Seton Hall subsequently notified plaintiffs that if the Order refused to grant them

permission to remain for that year, the University would termi-
nate their appointments as of June 30, 1983, notwithstanding its
failure to have provided the required twelve-month written
notice and terminal-year contracts. No such permission being
granted, Seton Hall effectively terminated plaintiffs' appoint-
ments on that date.

Plaintiffs filed a Complaint in the Law Division seeking
compensatory and punitive damages on each count as follows:
for breach of contract (count one); breach of a covenant of
good faith and fair dealing (count two); common-law retaliatory
discharge (counts three and four) (see *Pierce v. Ortho Pharma-
ceutical Corp.*, 84 *N.J.* 58, 417 *A.*2d 505 (1980)); tortious
interference with contractual rights (count five); Seton Hall's
ratification of the acts of the individual defendants, rendering
the University vicariously liable (count six); gender discrimina-
tion (count seven); wrongful discharge in violation of an em-
ployee manual (count eight) (see *Woolley v. Hoffmann–La-
Roche, Inc.*, 99 *N.J.* 284, 297–98, 491 *A.*2d 1257, *modified*, 101
*N.J.* 10, 499 *A.*2d 515 (1985)); tortious interference with pro-
spective economic advantage (count nine); and tortious interfer-
ence with contractual rights and prospective economic advan-
tage (count ten). Plaintiffs later withdrew their gender-dis-
crimination claims. The trial court denied Seton Hall's sum-
mary-judgment motion, in which the University had asserted its
First Amendment challenge. Before submitting the case to the
jury the court dismissed plaintiffs' claims contained in counts
three through five and counts eight through ten, as well as all
claims for punitive damages. The jury awarded each plaintiff
$45,000 in compensatory damages for breach of contract.

The Appellate Division, concluding that "the facts tend to
show that the religious issues are inseparably intertwined with
the secular issues," 243 *N.J.Super.* at 276, 579 *A.*2d 332,
reversed the judgment awarding plaintiffs damages, *id.* at 278,
280, 579 *A.*2d 332, and remanded the case for trial. *Id.* at 280,
579 *A.*2d 332. The court declared:

The issue of whether Seton Hall honestly possessed a religious belief which impelled it to breach its contract with plaintiffs is a factual one which must be presented to the jury. Special interrogatories should be submitted so that if the jury finds that Seton Hall honestly possessed this religious belief [namely, that by renewing plaintiffs' contracts without the express permission of the Ursulines, the University would have transgressed canon law] and did not manufacture it to achieve a nonreligious goal, the contract cause of action should be dismissed as it requires an impermissible inquiry into religious doctrine. If, however, the jury determines that Seton Hall did not honestly possess the religious belief that it was forbidden to enter into a contract with plaintiffs without the Ursulines' permission, it may proceed to determine all of the remaining issues. [*Ibid.*]

The court added that in assessing the University's "honest conviction," the jury should ascertain whether religious concerns had motivated Seton Hall to ascertain the Ursulines' position. *Id.* at 278, 579 *A.*2d 332.

The Appellate Division also reinstated counts five, nine, and ten (the tortious-interference counts), but affirmed the dismissal of counts three, four, and eight of plaintiffs' complaint, *id.* at 278–80, 579 *A.*2d 332, which counts are not involved in the proceedings before us. The Appellate Division affirmed as well the trial court's dismissal of the punitive-damages aspects of all claims, likewise not before us on this appeal.

Seton Hall, Hampton, Boncher, and Shannon filed an appeal as of right raising a substantial constitutional question, *R.* 2:2-1(a)(1), namely, whether "the Free Exercise Clause mandates that a civil court abstain from deciding a case that, by implication, also passes judgment on matters of religion." We also granted their petition for certification, 126 *N.J.* 329, 598 *A.*2d 887 (1991), and denied plaintiffs' cross-petition, *ibid.* Defendants' petition raises the additional question, which we need not reach, of "[w]hether the inquiry into the sincerity of a religious belief in a civil case is for a court or jury."

Defendants concede in their briefs that they breached the employment contract, but they argue that the First Amendment precludes civil courts from enforcing such contracts when the dispute between the parties is essentially doctrinal. Relying on plaintiffs' status as clerics, defendants contend that when an

employment duty owed to a cleric by a religious institution of the same faith conflicts with a religious command, the First Amendment forbids courts from adjudicating the dispute. In short, they argue that in such cases any judicial action short of abstention violates the Free Exercise Clause. They also emphasize what they characterize as ambiguity in so much of the Appellate Division opinion as implements the "sincerity" requirement.

We now hold that because the employment dispute implicates neither doctrinal issues nor issues of church polity, the trial court properly exercised jurisdiction over the case. We further conclude that the parties did not intend that the contract incorporate canon law, and therefore enforcement of the contract would not transgress the Free Exercise Clause of the First Amendment. Because defendants failed to demonstrate that the dispute turns on issues of doctrine or polity, the "sincerity" of their religious beliefs is not legally relevant to the jurisdictional claim.

We therefore modify the Appellate Division judgment and reinstate the jury award of $45,000 compensatory damages for each plaintiff. We conclude further that a remand on the tortious-interference claims, as ordered by the Appellate Division, is unnecessary because (1) there can be no additional award of compensatory damages on those counts inasmuch as plaintiffs acknowledge that the jury award of $45,000 for each plaintiff represents the full amount of their monetary losses, and (2) no challenge to the Appellate Division's affirmance of the dismissal of the punitive-damages claims is properly before us on this appeal.

## II

We summarize the basic principles recently stated in Justice Handler's comprehensive opinion in *Elmora Hebrew Center v. Fishman*, 125 *N.J.* 404, 593 *A.2d* 725 (1991):

The First Amendment to the United States Constitution forbids civil courts from deciding issues of religious doctrine or ecclesiastical polity. *Id.* at 413, 593 *A.*2d 725 (citing *Watson v. Jones,* 80 *U.S.* (13 *Wall.*) 679, 728–30, 20 *L.Ed.* 666, 676–77 (1871); *Chavis v. Rowe,* 93 *N.J.* 103, 105, 459 *A.*2d 674 (1983)).

However, the courthouse doors remain open to religious parties or institutions for the civil adjudication of secular legal questions, and "the civil courts to some degree have a duty to protect state interests in the resolution of disputes over ownership and control of property." *Ibid.* (citing *Jones v. Wolf,* 443 *U.S.* 595, 602, 99 *S.Ct.* 3020, 3025, 61 *L.Ed.*2d 775, 784 (1979) (citing *Presbyterian Church v. Hull Church,* 393 *U.S.* 440, 445, 89 *S.Ct.* 601, 604, 21 *L.Ed.*2d 658, 663 (1969))).

Courts have the power, "and perhaps the duty as well," to enforce secular contract rights, despite the fact that the contracting parties may base their rights on religious affiliations. *Id.* at 414, 593 *A.*2d 725. "Thus, courts can and do decide secular legal questions in cases involving some background issue of religious doctrine, so long as the courts do not intrude into the determination of the doctrinal issues." *Ibid.*

In appropriate circumstances a court may apply neutral principles of law to determine disputed questions that do not implicate religious doctrine. *Ibid.* " 'Neutral principles' are wholly secular legal rules whose application to religious parties or disputes does not entail theological or doctrinal evaluations." *Id.* at 414–15, 593 *A.*2d 725.

Defendants have couched their argument in terms of the Free Exercise Clause. They contend, in effect, that jurisdiction over this employment dispute would unconstitutionally interfere with Seton Hall's right freely to exercise its religious beliefs. See *Hernandez v. Commissioner of Internal Revenue,* 490 *U.S.* 680, 698, 109 *S.Ct.* 2136, 2148, 104 *L.Ed.*2d 766, 786 (1989) (recognizing a religious institution's right to free exercise of religion); *Kedroff v. Saint Nicholas Cathedral,* 344 *U.S.* 94, 116, 73 *S.Ct.* 143, 154, 97 *L.Ed.* 120, 136 (1952) (same). The Appellate Division, relying on plaintiffs' status as clerics and on Seton Hall's "special relationship" with the Archdiocese of Newark, 243 *N.J.Super.* at 273, 579 *A.*2d 332, and resorting to the above-stated basic principles, concluded that an ecclesiastical quality permeated the employment relationship between the University and the Welters. It therefore determined that jurisdiction over the dispute impermissibly entangled the court in either the doctrine or the polity of the Roman Catholic Church.

However, the Appellate Division's analysis oversimplifies the critical distinction between employees of religious institutions whose duties include spreading their faith and employees charged with purely secular obligations. *See Minker v. Baltimore Annual Conference*, 894 *F*.2d 1354, 1358 (D.C.Cir.1990); *Rayburn v. General Conference*, 772 *F*.2d 1164, 1171–72 (4th Cir.1985), *cert. denied*, 478 *U.S.* 1020, 106 *S.Ct.* 3333, 92 *L.Ed*.2d 739 (1986); *Equal Employment Opportunity Comm'n v. Southwestern Baptist Theological Seminary*, 651 *F*.2d 277, 283 (5th Cir.1981), *cert. denied*, 456 *U.S.* 905, 102 *S.Ct.* 1749, 72 *L.Ed*.2d 161 (1982). *But see Catholic High School Ass'n v. Culvert*, 753 *F*.2d 1161, 1163, 1169 (2d Cir.1985) (rejecting First Amendment challenge to National Labor Relations Board's jurisdiction over unfair-labor-practice complaints against parochial schools by lay teachers obligated to transmit religious values to students). *See generally* Bruce B. Bagni, *Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Institutions*, 79 *Colum.L.Rev.* 1514, 1543 (1979) (noting that because traditional free-exercise test entails tangential assessment of merits of asserted belief, courts should "ask whether the religious mission permeates the educational process"). The decision below fails to account for the intent or reasonable expectations of the parties in creating the employment relationship at issue. *See Jones, supra*, 443 *U.S.* at 603–04, 99 *S.Ct.* at 3025, 61 *L.Ed*.2d at 785 (Through "appropriate reversionary clauses and trust provisions," religious institutions can provide for disposition of church property in the event of a given contingency or decide which religious body will determine ownership should a schism or doctrinal controversy occur); *Watson, supra*, 80 *U.S.* (13 *Wall.*) at 714, 20 *L.Ed.* at 670 ("Religious organizations come before [the courts] in the same attitude as other voluntary associations.").

Only when the underlying dispute turns on doctrine or polity should courts abdicate their duty to enforce secular rights. Judicial deference beyond that demarcation would

transform our courts into rubber stamps invariably favoring a religious institution's decision regarding even primarily secular disputes. *Serbian Orthodox Diocese v. Milivojevich*, 426 *U.S.* 696, 734, 96 *S.Ct.* 2372, 2392, 49 *L.Ed.*2d 151, 177 (1976) (Rehnquist, J., dissenting). We reject the notion that an employee's status as a cleric within a religious organization, standing alone, justifies judicial abstention from enforcement of rights in job security, which this Court has previously recognized as important, see *Woolley, supra* 99 *N.J.* at 300, 491 *A.*2d 1257. Such a dividing line would preclude a cleric's enforcement of even purely secular rights against an institution of the same religion.

## A

■ In the context of federally-regulated employment decisions, Congress has attempted to distinguish between employment disputes that our courts may decide and those that the First Amendment places beyond judicial resolution. Thus, Title VII expressly exempts from the ambit of the Civil Rights Act of 1964 all employment decisions by a religious institution "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [religious institution] of its activities." 42 *U.S.C.A.* § 2000e–1. In exploring the limits of that exemption, federal courts apply what some have termed a "ministerial-function" test. See *Little v. Wuerl*, 929 *F.*2d 944, 947–48 (3d Cir.1991); *Minker, supra*, 894 *F.*2d at 1356–58; *Natal v. Christian & Missionary Alliance*, 878 *F.*2d 1575, 1578 (1st Cir.1989); *Rayburn, supra*, 772 *F.*2d at 1168, 1171–72; *Southwestern Baptist, supra*, 651 *F.*2d at 283–85. Under that test, if the employee's responsibilities transform the employee into a liaison between the religion and its adherents or if the "employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship," the First Amendment precludes

judicial resolution of the dispute. *Rayburn, supra,* 772 *F.*2d at 1168–69 (citing Bagni, *supra,* 79 *Colum.L.Rev.* at 1545).

■■ Cases in both the federal system and our own courts indicate that when an employee engages in "ministerial functions" for the employer, courts may not exercise jurisdiction over a suit to enforce the employment agreement. *Minker, supra,* 894 *F.*2d at 1356–58; *Natal, supra,* 873 *F.*2d at 1578; *Rayburn, supra,* 772 *F.*2d at 1168, 1171–72; *Southwestern Baptist, supra,* 651 *F.*2d at 283–85; *see Little, supra,* 929 *F.*2d at 947–48; *cf. Chavis, supra,* 93 *N.J.* at 112, 459 *A.*2d 674 (holding that First Amendment precludes judicial inquiry into propriety of removal procedures followed in "defrocking" of deacon). Those cases rely on the sound proposition that to interfere with a religious employer's choices regarding who may propagate the faith or who may train others to do so is to entangle the judiciary impermissibly in matters of polity. We agree that an employee's function under the employment relationship at issue rather than whether the employee holds ecclesiastical office determines whether the court should abstain from entertaining the dispute. Except in a situation involving enforcement of both parties' manifest consent to submit such disputes to a particular tribunal, see *Fishman, supra,* 125 *N.J.* at 416–17, 593 *A.*2d 725; *Baugh v. Thomas,* 56 *N.J.* 203, 205, 265 *A.*2d 675 (1970), jurisdiction over disputes involving an employee of a religious institution who performs ministerial functions would entail unconstitutional judicial entanglement in polity.

We can conceive of no greater incursion into the exercise of religion than a limitation on the factors an institution may consider in deciding whether to hire or terminate an employee who is charged with propagating the religion or is functioning as an intermediary between the religious institution and its adherents. That danger persists even in cases in which the alleged breach of the employment contract resulted from entirely non-doctrinal considerations, because when the employee

fulfills a ministerial function for the employer, intrusion into the employment relationship directly affects the religion's formal doctrine. If the State may choose, or even limit the religious employer's options in choosing, those to whom it will entrust the propagation of the faith, the State effectively dictates the course of the religion. *Cf. Chavis, supra,* 93 *N.J.* at 112, 459 *A.*2d 674 ("Insinuation by civil courts into the customs and usages of the by-laws and the constitution [of the church], into the administration and polity of the church in the hope of uncovering clues to the correct disciplinary procedures, threatens the freedom of religious institutions from secular entanglement.").

We hasten to add that religious institutions are free to bargain away the right to unimpeded discretion in deciding which persons are most qualified to minister the religion or to train those who will eventually minister the faith. A cursory judicial review of the employment manual or contract to determine whether the ministerially-functioning employee and the religious institution expressly included such a waiver will not transgress the First Amendment. *See Jones, supra,* 443 *U.S.* at 603–04, 99 *S.Ct.* at 3025, 61 *L.Ed.*2d at 785; *Fishman, supra,* 125 *N.J.* at 416–17, 593 *A.*2d 725 (enforcing judgment of religious tribunal concerning doctrinal issues when parties, in effect, consented to jurisdiction of that tribunal as opposed to others); *Baugh, supra,* 56 *N.J.* at 205, 265 *A.*2d 675 (enforcing contractual provision, to which both parties had agreed, setting forth mechanism for removal of worshipper from church).

## B

In assessing whether an employment dispute implicates doctrinal issues, a court should examine the circumstances surrounding creation of the employment relationship. When those circumstances indicate that the parties intended that control of the interest—in this case a teaching position at Seton Hall—would depend on doctrinal matters, the court is

adjured to defer to the highest ecclesiastical authority to have ruled on the issue. *See Watson, supra,* 80 *U.S.* (13 *Wall.*) at 726–32, 20 *L.Ed.* at 676–77; *Fishman, supra,* 125 *N.J.* at 414, 593 *A.*2d 725. The parties may manifest such an intent by expressly stating it in the instrument, see *Little, supra,* 929 *F.*2d at 945, or by creating or submitting to a tribunal for adjudication of such matters, see *Fishman, supra,* 125 *N.J.* at 416–17, 593 *A.*2d 725; *Baugh, supra,* 56 *N.J.* at 205, 265 *A.*2d 675.

 Several factors should inform judicial assessment of the parties' reasonable intent. Those factors include the text of the contract, the parties' actions, and the nature of the employment as discerned by application of the ministerial-function test. A determination that the employee did not perform ministerial functions for the religious institution not only will favor the conclusion that the court may entertain the suit but also will indicate that the parties to the contract could not reasonably have contemplated that that agreement would incorporate the strictures of the religion. A court might also determine that a ministerially-functioning employee contracted with the employer to avail himself or herself of the jurisdiction of secular courts. Conversely, courts should enforce non-ministerially-functioning employees' contractual waivers of the right to avail themselves of secular law. Similarly, courts should respect contractual waivers of a religious institution's right to exercise certain tenets of the religion even in cases in which the non-ministerially-functioning employee holds religious office. *Cf. Serbian Orthodox, supra,* 426 *U.S.* at 720, 96 *S.Ct.* at 2385, 49 *L.Ed.*2d at 170 (implying that clear contractual provisions may constitute waiver of, or submission to, jurisdiction).

### III

We therefore proceed to ascertain whether plaintiffs' employment duties included their functioning as intermediaries between the church or the clerical authority in the University and

the community or student body. If the Welters did not perform ministerial functions under their employment agreement with Seton Hall, the question remains whether the parties contemplated, or reasonably should have contemplated, that the contract incorporated Roman Catholic Canon Law.

## A

Defendants concede that but for plaintiffs' status as clerics, this case presents a purely secular issue cognizable in the civil courts. *See Jewish Center v. Whale*, 86 *N.J.* 619, 626–27, 432 *A.*2d 521 (1981). However, "[w]hile religious organizations may designate persons as ministers for their religious purposes free from any government interference, bestowal of such a designation does not control their extra-religious legal status." *Southwestern Baptist, supra*, 651 *F.*2d at 283. We conclude that plaintiffs performed no ministerial duties for Seton Hall.

In *Southwestern Baptist, supra*, the Fifth Circuit defined employees charged with ministerial responsibilities as "intermediaries between a church and its congregation * * * [who] attend the needs of the faithful [and] instruct students in the whole of religious doctrine." 651 *F.*2d at 283 (quoting *Equal Employment Opportunity Comm'n v. Mississippi College*, 626 *F.*2d 477, 485 (5th Cir.1980), *cert. denied*, 453 *U.S.* 912, 101 *S.Ct.* 3143, 69 *L.Ed.*2d 994 (1981)). The mere fact that the "faculty members are expected to serve as exemplars of practicing Christians does not * * * make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern." *Ibid.* Similarly, in *Rayburn, supra*, the Fourth Circuit observed that the "ministerial exception to Title VII * * * does not depend upon ordination but upon the function of the position." 772 *F.*2d at 1169 (citing *McClure v. Salvation Army*, 460 *F.*2d 553 (5th Cir.), *cert. denied*, 409 *U.S.* 896, 93 *S.Ct.* 132, 34 *L.Ed.*2d 153 (1972); *Southwestern Baptist, supra*, 651 *F.*2d 277).

Unlike *Alicea v. New Brunswick Theological Seminary*, 128 *N.J.* 203, 608 *A.*2d 218 (1992), also decided today, the record in this case contains no indication that plaintiffs counselled students at any time regarding spiritual or moral matters or that the position of computer-science professor entailed instillation of religious values in students. Nor does the average age or religious background of the Seton Hall student body give rise to an inference that the Welters' daily responsibilities included imbuing with Roman Catholic values those students who were enrolled in the computer-sciences program, students who were using equipment in the computer laboratory, or the general student population. *See generally* Bagni, *supra*, 79 *Colum.L.Rev.* at 1539–41 (discussing the factors relevant to the determination of whether the religious institution performs a secular or non-secular function). In no sense did the Welters function as conduits between defendants or the Roman Catholic Church and the faithful. Whereas review of the Ursulines' dismissal of plaintiffs from their Order might have implicated polity-based concerns, judicial assessment of the manner in which Seton Hall terminated plaintiffs involves singularly secular considerations.

### B

As well, the record fails to support a finding that plaintiffs contemplated, or reasonably should have contemplated, that Roman Catholic Canon Law would supersede the express procedural safeguards of the contract. The purely secular nature of plaintiffs' employment obligations; the absence of a contractual provision imposing religious obligations on plaintiffs; Seton Hall's rejection of the Ursulines' prior request regarding plaintiffs' paychecks; and the absence of any religious connotations behind the hiring of, tenure of, or decision to terminate plaintiffs all plainly indicate the contrary.

To address plaintiffs' punitive-damage claims, Seton Hall called an expert in canon law to establish a religious, and

therefore non-malicious, motive for breach of the employment contract. That expert testified not that the canons *precluded* the University from offering terminal-year contracts but rather merely that Seton Hall's decision "was consistent with" canonical doctrine. In fact, at oral argument, defendants could not confirm that plaintiffs' dismissal from the Ursulines would have required that Seton Hall dismiss them.

Nor could Seton Hall show that it had hired plaintiffs because they were clerics or that their status as clerics bolstered their effectiveness as professors of computer sciences. Rather, at a time when computer-related skills were rare, and therefore at a premium, the University hired plaintiffs to contribute to its fledgling computer-sciences department. The tenor of the present dispute regarding plaintiffs' alleged misrepresentations about their experience merely highlight the secular nature of their employment under the contract.

We therefore conclude that the parties' employment contract did not incorporate an implied covenant to abide by Roman Catholic Canon Law. Indeed, it did not require even that plaintiffs remain members of the Roman Catholic Church. The cited canons played no role in the relationship between Seton Hall and plaintiffs. Therefore, the First Amendment would not bar a court's exercise of jurisdiction over the parties' contract dispute.

## IV

Because these parties did not contemplate that canon law would affect the enforceability of the employment contract, neither the correctness nor the sincerity of defendants' interpretation of canon law influenced resolution of this secular employment dispute. In reaching that conclusion we assess only the relevance of defendants' convictions regarding the scriptural strictures to which they apparently adhere. *See Thomas v. Review Bd.*, 450 *U.S.* 707, 715–16, 101 *S.Ct.* 1425, 1430–31, 67 *L.Ed.*2d 624, 632 (1981) (reversing a lower court's

determination that Jehovah's Witness's refusal to work in armaments factory was mere personal choice because "courts are not arbiters of scriptural interpretation," but recognizing the potential for asserted claims that are so "clearly nonreligious in motivation * * * as not to be entitled to protection under the Free Exercise Clause"). Even if defendants sincerely believed that canon law required immediate termination contrary to the contract's express requirements, they entered a contract with plaintiffs that included no provision protecting that belief. Thus, although the sincerity of a religious institution's belief may relate to a court's decision whether to grant a First Amendment-based exemption from neutral and involuntary government regulations, see *id.* at 715–16, 101 *S.Ct.* at 1430–31, 67 *L.Ed.*2d at 632, it rarely disposes of a Free Exercise challenge to voluntarily-assumed contractual obligations.

This case differs markedly from the vast majority of previous intra-religion cases, which challenged deprivations of a party's status within a religion and which concerned only incidental deprivations of the secular trappings of that former status within the faith. Just as the existence of a tangential secular issue does not authorize civil courts to override primarily doctrinal determinations by authorities in hierarchial religions, *Serbian Orthodox, supra,* 426 *U.S.* at 709, 96 *S.Ct.* at 2385, 49 *L.Ed.*2d at 162, inconsequential doctrinal issues that were irrelevant to the employment relationship do not preclude doctrinally-objective enforcement of a secular interest pursuant to a secular agreement. Although plaintiffs may have submitted voluntarily to the unreviewable discipline of the Ursulines and the Roman Catholic Church, their religious affiliation with the Ursulines, contrary to Seton Hall's contention, did not amount to a waiver of secular rights to which their status as clerics was incidental at best. *Cf. id.* at 732–33, 96 *S.Ct.* at 2385, 49 *L.Ed.*2d at 176 (Rehnquist, J., dissenting) (emphasizing that the inquiry in addressing an Establishment Clause challenge is "whether the [affiliates of the same religion] had bound themselves to abide by the decisions of the [hierarchical

authority] in the matter[ ] at issue"). Although we do not question the University's general commitment to Canon Law, we are mindful that in creating a bargained-for obligation to adhere to procedural safeguards that did not account for its obligations under Canon Law, Seton Hall acknowledged that any dispute with the Welters arising out of the employment relationship would be governed by those express contract provisions.

We emphasize that in the absence of a contractual clause expressly incorporating religious doctrine into the contract or agreement, litigants will be hard-pressed to demonstrate such an implied covenant or condition precedent governing a contract with an employee whose duties include little or no ministerial tasks. The American Association of Theological Schools' manual of *Procedures, Standards and Criteria for Membership* provides: "Institutional policies with respect to all conditions of employment * * * shall be available to all affected persons. These policies shall be in a faculty handbook or other public document." We are aware that that passage may not carry the force of law. However, religious or quasi-religious institutions attempting to provide an intellectually-unstifled environment through maintenance of the tenure system should bear the burden of notifying non-ministerially-functioning employees of the applicability of religious strictures.

V

Plaintiffs concede that in awarding each plaintiff $45,000 compensatory damages, the jury gave the full amount to which each was entitled save for any punitive damages that might accompany a verdict on the tortious-interference counts. The trial court dismissed those three counts but the Appellate Division restored them, although it upheld the dismissal of the punitive-damages claims. Because plaintiffs have been fully compensated and because the propriety of the dismissal of plaintiffs' claims for punitive damages is not before us on this

appeal, no issue in respect of the tortious-interference counts survives and hence no remand is necessary. We therefore need not address any of the provocative issues that otherwise might be posed by the tortious-interference claims. See, *e.g.*, *Printing Mart–Morristown v. Sharp Electronics*, 116 *N.J.* 739, 563 *A.*2d 31 (1989).

## VI

The judgment of the Appellate Division is reversed and the judgment of $45,000 in favor of each plaintiff is reinstated.

*For reversal and reinstatement*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.