

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-16-1996

# Scotts African Union v. Conf AUFCMP Church

Precedential or Non-Precedential:

Docket 95-5379

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Scotts African Union v. Conf AUFCMP Church" (1996). *1996 Decisions*. Paper 50.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/50

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 95-5379


SCOTTS AFRICAN UNION METHODIST PROTESTANT CHURCH

v.

CONFERENCE OF AFRICAN UNION FIRST COLORED METHODIST
PROTESTANT CHURCH a/k/a AFRICAN UNION METHODIST PROTESTANT CHURCH

The Conference of AUFCMP Church,
                                    Appellant



On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 92-CV-00880)



Argued:  February 5, 1996

Before:  SLOVITER, Chief Judge, ROTH and McKEE,
Circuit Judges

(Filed October 16, 1996)


K. Kay Shearin (Argued)
Elsmere, DE  19805

        Attorney for Appellant

Roland G. Hardy, Jr. (Argued)
Law Offices of Roland G. Hardy, Jr.
Woodbury, NJ  08096

        Attorney for Appellee

                OPINION OF THE COURT

SLOVITER, Chief Judge.

        At issue is the ownership of certain real property in
Camden, New Jersey.  The district court held that Plaintiff
Scotts African Union Methodist Protestant Church ("Scotts
Church") was the valid titleholder to the property in dispute,
rejected the counterclaim filed by Defendant Conference of
African Union First Colored Methodist Protestant Church ("the

Conference") to quiet title to the same property, and enjoined the Conference from claiming any ownership interest therein.  The Conference appeals.

I.

Background

Scotts Church was incorporated in 1915 as a nonprofit corporation under New Jersey's Act to Incorporate Associations Not For Pecuniary Profit, ch. 181, 1898 N.J. Laws 422, repealed by New Jersey Nonprofit Corporation Act, ch. 127, 1983 N.J. Laws 397 (codified at N.J. Stat. Ann. § 15A:2-1).  It had acquired property on Kaighn Avenue in Camden, New Jersey around 1904, and conducted religious services and other activities there until 1974.  In 1974, Scotts Church sold the Kaighn Avenue property and used the proceeds to purchase property on Baird Boulevard in Camden, with title in the name of Scotts Church.

At some point in time left unspecified in the record, see App. at 11; Joint Final Pre-Trial Order at 2-4, Scotts Church became a member congregation of the Conference.  The Conference is the administrative body of a religious organization known as the African Union Methodist Protestant ("AUMP") Church.  The AUMP Church is a regional association of several local churches located in the mid-Atlantic states and tied by their common adherence to the AUMP denomination and doctrine.  The association was incorporated in Delaware in 1941 and changed its name to "The Conference of African Union First Colored Methodist Protestant Church" in 1953.  Def. ex. 15.  The Conference claims itself the successor to the Union Church of Africans, which was incorporated in 1813, although that was an issue of fact determined against the Conference at trial.

The Conference is defined in the Book of Discipline, see infra, as an "administrative body in the [structure] of the AUMP Church," Pl. ex. 5 at 157, although there is some ambiguity in the record as to whether the Conference and the AUMP Church are distinct entities.  We need not resolve this question for purposes of this appeal.  The Conference and the AUMP Church are governed by The Book of Discipline of the African Union First Colored Methodist Protestant Church and Connection in the United States of America and the World ("Book of Discipline" or "Discipline"), which contains rules and procedures that serve as corporate bylaws of the Conference and Scotts Church.  Scotts Church regularly has sent delegates to Conference meetings involving local church participation.  It additionally has concluded annual "pastoral contracts" with pastors selected for it by the Conference, whom Scotts Church agreed to compensate and retain on a yearly basis.

The pastoral contracts concluded for the 1990-91 and 1991-92 years state that the trustees of Scotts Church "will be responsible as to all mentioned in the Book of Discipline according to the 1958 AUFCMP Church, Inc., and any/all revisions made to the Book of Discipline, entitled the Duties of the Trustees."  Def. exs. 3, 4.  The contracts also provide that the pastor of Scotts Church "is responsible to Trustees of the above said mentioned Church, of the first part, [and] will be responsible as to all mentioned in the Book of Discipline

according to the 1958 AUFCMP Church, Inc. and any/all revision[s] made to the Book of Discipline, entitled The Duty of Ministers in Charge."  Id.

On January 19, 1991, the Conference held a meeting at which the attendees approved a resolution entitled "Church Property" ("Property Resolution").  The present dispute between Scotts Church and the Conference implicates three portions of the Property Resolution's text in particular.  The first is a paragraph entitled "Titles to Properties" and provides in relevant part:

> [T]itles to all properties held . . . by a local church . . . shall be held in trust for The African Union Methodist Protestant Church and subject to the provisions of its Discipline.  Titles are not held by The African Union Methodist Protestant Church or by "The General Conference of The African Union Methodist Protestant Church," but instead by the incorporated conferences, agencies, or organizations of the denomination, or in the case of unincorporated bod[i]es of the denomination, by boards of trustees established for the purpose of holding and administering property.

Def. ex. 1 at C-1.

The second portion of the 1991 Property Resolution, a group of paragraphs under the heading "Trust Clauses in Deeds," requires in part that "all written instruments of conveyance" by which church properties are held or acquired for worship purposes contain the following language:

> In trust, that said premises shall be used, kept, and maintained as a place of divine worship of the African Union Methodist Protestant ministry and members of The African Union Methodist Protestant Church, subject to the Discipline, usage, and ministerial appointments of said church as from time to time auth[or]ized and declared by the General Conference and by the Annual Conference within whose bounds the said premises are situated.  This provision is solely for the benefit of the grantee, and the grantor reserves no right or interest in said premises.

Id.  This "Trust Clauses in Deeds" portion of the Property Resolution also provides that where a deed exists without the required trust clause language, the local church nevertheless owes a "responsibility and accountability" to the AUMP Church if it has affirmed its affiliation by accepting a Conference-appointed pastor.  Id. at C-2.  For purposes of his decision, the

magistrate judge assumed that this "responsibility and accountability" language was intended to compel a local church to hold its property in trust for the Conference even where the governing deed omitted the required trust clause. App. at 21.

Finally, a paragraph of the Property Resolution entitled "Incorporated Local Church Property -- Title and Purchase," provides:

> [T]he title to all property, now owned or
> hereafter acquired by an incorporated local
> church . . . shall be held by and/or conveyed
> to the corporate body in its corporate name,
> in trust for the use and benefit of such
> local church and of The African Union
> Methodist Protestant Church.

Def. ex. 1 at C-11. According to an affidavit and testimony from Bishop Delbert Jackson, Presiding Prelate of the Conference, the Property Resolution became an amendment to the Book of Disciplineupon adoption. See Summ. Judg. Op. at 20; Trial Transcript at 41; see also Appellant's Brief at 8.

Some three months later, at a meeting held on April 6, 1991, the Conference approved a "Signature Resolution" which provides that "ministers in charge of [the local] churches shall be empowered to sign official documents pertaining to the individual local church and The Conference." Def. ex. 2; App. at 21-22. According to Bishop Jackson's affidavit, the Signature Resolution, like the Property Resolution, constituted an amendment to the Book of Discipline upon adoption. See Summ. Judg. Op. at 21.

The Conference promptly used these two resolutions as ostensible authority to take title to property held by the local churches, a move that we are told generated a number of lawsuits. At the April 6, 1991 meeting, the Conference -- invoking its newly adopted Signature Resolution -- instructed Scotts Church pastor Dr. Eva M. Walters to sign a quitclaim deed transferring Scotts Church's Baird Boulevard property to the Conference. Dr. Walters signed the deed, which states that "the trustees of the SCOTTS AFRICAN UNION METHODIST PROTESTANT CHURCH have caused its name by Reverend Dr. Eva M. Walters, its Pastor, to be hereunto set." Pl. ex. 3. The deed was recorded on April 26, 1991.

Scotts Church's certificate of incorporation dated 1915 provides that its trustees "shall not dispose of any real estate so acquired by them as Trustees, except [as] such act be authorized by a vote of two thirds of the members of said Church Body." Pl. ex. 1. Neither the trustees nor the members of Scotts Church approved the transfer of the Baird Boulevard property, and on March 26, 1992 -- by a 24-0 vote of its members -- Scotts Church opted to disaffiliate itself from the Conference.

Scotts Church filed suit in January 1992 in the Chancery Division of the Superior Court of New Jersey, Camden County, seeking a declaratory judgment that the Conference held no interest in the Baird Boulevard property and that the

quitclaim deed was invalid, as well as injunctive relief preventing the Conference from asserting any ownership interest in the property.  The Conference, alleging both federal question and diversity jurisdiction, had the case removed to the United States District Court of New Jersey.  Counterclaiming to have "its" title to the Baird Boulevard property quieted, the Conference also moved for dismissal of the action, summary judgment, and imposition of Rule 11 sanctions.  The Conference's motions were denied.

In ruling on the summary judgment motion, the district court addressed, inter alia, the Conference's argument that under First Amendment principles the court must give deference to the determinations of the Conference, as the highest authority in a hierarchical church.  The court rejected that argument, relying on the New Jersey Supreme Court's opinion in Elmora Hebrew Center v. Fishman, 593 A.2d 725 (N.J. 1991), to hold that the courts of New Jersey would apply "neutral principles of law" to resolve this dispute rather than deferring to the church hierarchy.

The parties consented to trial by a magistrate judge (hereafter interchangeably referred to as the "trial court") pursuant to 28 U.S.C. § 636(c) who, after a one-day bench trial, determined the quitclaim deed invalid and granted the declaratory and injunctive relief sought by Scotts Church.  Scotts Church had contended that the deed was invalid because Bishop Jackson had fraudulently induced Dr. Walters to sign by falsely assuring her that the Scotts Church trustees had already authorized the transfer.  The magistrate judge found no evidence to support that assertion or the fact that Dr. Walters had relied upon any representation regarding the trustees' approval upon signing the deed.  App. at 23.

Instead, the magistrate judge, applying "neutral principles of law" in accordance with the district court's summary judgment opinion, evaluated the relevant documents, provisions, and factual circumstances, and determined that the quitclaim deed was invalid and that Scotts Church retained title to the disputed property.  The content of that determination can be described in terms of six distinct issues, though the opinion itself was not organized accordingly.

(1) Scotts Church Certificate of Incorporation

The first was the text of Scotts Church's certificate of incorporation, which dates from 1915.  That certificate reads, in relevant part:

> AFRICAN UNION FIRST COLORED METHODIST
> PROTESTANT CHURCH OF CAMDEN, NEW JERSEY.
>
> THIS IS TO CERTIFY that we, Perry Gleaves, Leonard S. Smith, John F. Bartee, Thomas Kenaman, Enoch Grisden, Joseph Pierce, and Charles Stewart, do hereby associate ourselves into a corporation under and by virtue of an act of the Legislature of the State of New Jersey . . . .
>
> 1.   The name of the association or

corporation is AFRICAN UNION FIRST COLORED
METHODIST PROTESTANT CHURCH OF CAMDEN, NEW
JERSEY.

2.   The purposes for which this association
or corporation is formed are for the worship
of Almighty God in accordance with the
dictates of our consciences and the rules[,]
regulations, doctrines, practices and beliefs
of the African Union Colored Methodist
Protestant Church;

   To acquire and possess property, both
real and personal, as Trustees as aforesaid,
by gift, grant or devise and to hold same in
trust for the uses and purposes of said
Church Body; to mortgage and dispose of the
same.

   That said Trustees shall not dispose of
any real estate so acquired by them as
Trustees, except [as] such act be authorized
by a vote of two thirds of the members of
said Church Body, who shall have been members
in good standing in said Church Body for at
least one year before the date of the meeting
at which such action shall be proposed.

   That the Trustees of said African Union
First Colored Methodist Protestant Church of
Camden, New Jersey shall, at the time of
their election, have been members of said
Church in good standing for at least one year
preceding their election . . . .

   The successors to the Trustees
hereinbefore named shall be [e]lected by
ballot . . . at a meeting of the members of
the Church . . . .

      . . . .

4.   There shall be seven Trustees of this
association or corporation and the names of
those selected for the first year are as
follows.  [The same seven names listed at the
beginning of the certificate are here
repeated, with accompanying Camden
addresses.]


Pl. ex. 1 (emphasis added).

   The parties disputed, in particular, the meaning of the

second clause of Paragraph 2 ("To acquire and possess property . . ."). Scotts Church argued that the phrase "said Church Body" appearing in that clause referred to the same church body appearing both at the top of the certificate and in Paragraph 1: the "African Union First Colored Methodist Protestant Church of Camden, New Jersey," (emphasis added), or Scotts Church. Scotts Church contended, therefore, that its certificate of incorporation specifically provided that property acquired by Scotts Church would be held "in trust for the uses and purposes" of Scotts Church, and prohibited the disposition of such property unless authorized by a two-thirds vote of its members.

The Conference, on the other hand, insisted that the same phrase "said Church Body" more naturally referred to the denominational entity "African Union Colored Methodist Protestant Church," the church body mentioned in the clause immediately preceding it in Paragraph 2. It argued, therefore, that the certificate of incorporation mandated that property acquired by Scotts Church be held in trust for the AUMP Church.

The magistrate judge determined that the text of the certificate supported Scotts Church's interpretation. First, he observed that although the Paragraph 2 reference to the AUMP Church specified adherence to the doctrine of that particular denomination, the Conference itself as an administrative body was nowhere mentioned in the document. See App. at 16-17.

Second, the magistrate judge interpreted the second clause of Paragraph 2 in light of the clause immediately following it, which permitted the disposition of property only where "authorized by a vote of two thirds of the members of said Church Body, who shall have been members in good standing in said Church Body." The magistrate judge relied on the two-thirds vote and members-in-good-standing references, and the improbability that either would involve the entire population of the AUMP organizational hierarchy, as strong indication that the recurring phrase "said Church Body" referred to the Scotts Church congregation proper. See App. at 17.

Third, the magistrate judge assumed arguendo, as the Conference urged, that the Book of Discipline and Invisible Strands, a historical tract, established that the African Union Church was incorporated in 1813 and that the African Union Church merged in 1865 with the First Colored Methodist Protestant Church to form the African Union First Colored Methodist Protestant Church. Nevertheless, he found those facts insufficient to establish that the Conference was the same entity as, or legal successor to, the African Union Church. The magistrate judge reasoned that as the Conference had failed to show that it had existed as a legal entity at any time before its own 1941 incorporation, it could not have been the legal beneficiary of a 1915 trust provision. He thus determined that Scotts Church's 1915 certificate of incorporation could not have directed the holding of property in trust for the yet unformed Conference. See App. at 12-14, 17.

Under the magistrate judge's interpretation of the certificate of incorporation, Scotts Church's property was held in trust for Scotts Church itself and subject to transfer only

upon trustee and congregation approval.  It followed that the April 6, 1991 quitclaim deed was invalid unless the Conference could provide a basis for overriding the certificate of incorporation.

(2) Property Resolution

The magistrate judge rejected the Conference's contention that the Property Resolution could provide a basis for the quitclaim deed.  The magistrate judge observed that while the language of the Property Resolution requiring local churches to hold their property in trust for the AUMP Church may have imposed upon the local churches certain obligations, none of its terms empowered pastors to transfer property by signing deeds.  The magistrate judge determined that the resolution's text in fact "required incorporated local churches to hold property in their own name, in trust for the purposes of that local church and for the AUMP Church," and therefore did not "legitimize a deed which purports to transfer property out of the name of Scotts Church and to [the Conference]."  App. at 26.

In addition, the magistrate judge declared the Property Resolution void because it was adopted at a meeting for which inadequate notice had been provided.  He noted that the Book of Discipline did not establish notice requirements for Conference meetings, and held that where a corporation's bylaws prescribe no such requirements "notice shall be given as provided for in state or local law."  App. at 36.  He therefore applied Title 8, § 222 of the Delaware Code requiring written notice of the place, time, and purpose of a special meeting "not less than 10 nor more than 60 days before the date of the meeting."  App. at 36-37 (quoting Del. Code Ann. tit. 8, § 222(b)).  Finding that no such notice had been given, the magistrate judge declared the Property Resolution to be the product of a procedurally defective meeting, and therefore invalid.

(3) Signature Resolution

The magistrate judge also eliminated the Signature Resolution as a possible basis for the validity of the April 6 quitclaim deed.  As with the Property Resolution, the magistrate judge first examined the language of the Signature Resolution and noted that while the resolution authorized local pastors to sign official business documents on behalf of local churches, nothing in the Signature Resolution eliminated the specific requirement applicable to Scotts Church that the church members first approve property transfers.  Rather, the Signature Resolution "merely authorizes Dr. Walters to sign the deed once the vote has been taken and action authorized."  App. at 26.

This interpretation is confirmed by statements made at the April 6, 1991 meeting by Bishop Jackson, and placed into evidence by an audiotape of the meeting, which the magistrate judge discussed as follows:

> When asked whether the Signature Resolution
> would override the authority of local church
> trustees, the Bishop replied that the
> resolution "does not take away the power of
> the trustees."  The Bishop repeatedly
> reassured the members that the resolution did

> not change existing procedures, that the pastor and trustees are to work together in any business action, and that the resolution only gave the pastor the power to sign alongwith the trustees. In response to one member's concern that the pastor could potentially act without the members' knowledge and "squeeze" the trustees out of power, the Bishop replied, "Before the pastor or the trustees can do anything, they have to take it back to the people."
>
> The attorney present at the meeting to present this resolution, K. Kay Shearin, Esq., also assured the members that "what the Bishop told you a few minutes ago was absolutely right." Ms. Shearin explained the impact of the Signature Resolution as simply giving the local churches the power of the Conference behind them when they want to transact business, particularly when they want to borrow money for expansion and development projects. "We're not taking anything away from the individual churches. The local trustees still have their authority."

App. at 26-27 (emphasis added) (citations omitted).

Viewing these assurances as further undercutting any possibility that the Signature Resolution had displaced either Scotts Church's two-thirds vote requirement for property transfers or the autonomy of its trustees, the magistrate judge held that the Signature Resolution, like the Property Resolution, "did not provide authority for Dr. Walters to sign a deed conveying the property in the absence of member and trustee approval," and therefore could not establish the validity of the quitclaim deed. App. at 27.

(4) Counterclaim/Secession Clause

The magistrate judge also rejected the Conference's counterclaim to quiet title. The Conference had contended that even if the quitclaim deed was invalid, once Scott Church seceded, the Conference necessarily emerged as titleholder because Scotts Church was to hold property in trust for the Conference. The magistrate judge noted that the 1974 deed placed title to the Baird Boulevard property in Scotts Church's name without trust language, and thus neither the deed nor the text of Scotts Church's certificate of incorporation bound Scotts Church to hold the property in trust for the Conference.

The only remaining argument proffered by the Conference in support of its counterclaim was based on a clause in the Book of Discipline that all church property "belonging to the Connection shall be deeded to the members and Connection, and should the members disband or secede the property shall remain in the possession of the Connection." Def. ex. 10; App. at 29. The

provision further states that "each local Church shall be so incorporated that if the members should disband or secede, the said Church and property shall remain in the Connection." Id. This secession clause, which appeared in the seventeenth edition of the Book of Discipline that was published in 1958, was apparently omitted from the most recent eighteenth edition of 1986.

The magistrate judge rejected the applicability of the secession clause on multiple grounds. First, he observed that the clause appeared only in a section of the 1958 Disciplineentitled "The Duty of Ministers in Charge." Def. ex. 10; App. at 29. Citing the text of the 1990–91 and 1991–92 pastoral contracts, the magistrate judge concluded that the provisions of that section bound only Scotts Church's pastor individually, rather than the local church collectively.

Second, the magistrate judge determined that the 1958 Discipline's secession clause, omitted from the current 1986 18th edition, was not effective at the time of Scotts Church's secession from the Conference in 1992, nor during the pendency of the 1990–92 pastoral contracts that required adherence to the Book of Discipline.

Finally, the magistrate judge found that the terms of the secession clause were so vague as to be inapplicable. The clause specifies that, upon a local church's secession, the church property "shall remain in the possession of the Connection." The magistrate judge noted that the Book of Discipline defined the "Connection" as "[t]he structural organization of all AUMP Local Churches having a connected network of compatible interdependent relationships to achieve the purpose of the church," but defined the "Conference" in different terms –– "[a]n administrative body in the struct[ure] of the AUMP Church such as general, annual, district, quarterly and ch[u]rch conference." Pl. ex. 5 at 157; App. at 31. Finding those divergent descriptions enough to prevent the "broad assumption" that property belonging to the Connection also belonged "derivatively" to the Conference, and invoking the principle that ambiguous language be construed against the drafter, the magistrate judge determined the secession clause ineffective. App. at 31–32.

(5) Constructive Trust

The magistrate judge declined the Conference's request to create a constructive trust in its favor, finding that Scotts Church did not obtain any unjust enrichment nor perform any wrongful act. See App. at 32–33.

(6) Conflict Rule

Finally, the magistrate judge noted that where a corporation's certificate of incorporation and bylaws are in conflict, New Jersey law dictates that "the certificate of incorporation ordinarily governs." App. at 38. Thus, the magistrate judge concluded that even if the Conference's claims regarding its Property Resolution were given full weight, the Resolution would be ineffective because it conflicted with the procedures in Scotts Church's certificate of incorporation for the disposition of property.

The magistrate judge accordingly entered declaratory judgment for Scotts Church, declaring the quitclaim deed invalid, and further enjoined the Conference from claiming any ownership interest in the disputed property. The Conference appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291. We must accept the magistrate judge's findings of fact unless they are clearly erroneous. Fed. R. Civ. P. 52(a); Grupo Protexa v. All American Marine Slip, 20 F.3d 1224, 1231 (3d Cir.), cert. denied, 115 S. Ct. 481 (1994); Goodman v. Lukens Steel Co., 777 F.2d 113, 128 (3d Cir. 1985), aff'd, 482 U.S. 656 (1987). Our review of the legal conclusions, including the assessment of state law, is plenary. Gruber v. Owens-Illinois Inc., 899 F.2d 1366, 1368 n.1 (3d Cir. 1990).

## II.
## Discussion
## A. Federal Constitutional Law

The Conference argues that the magistrate judge erred as a matter of law in applying neutral principles instead of the principle of deference. To understand this contention, we must travel through the Supreme Court's precedents involving intrachurch property disputes, in which it has attempted to draw a line between the constitutional interest in preserving the autonomy of religious organizations, on the one hand, and the civil interest in the definitive settlement of property disputes, on the other. We review each of the applicable Supreme Court decisions. As viewed seriatim, they provide historical perspective to the current status of the law.

The first such case, Watson v. Jones, 80 U.S. (13 Wall.) 679 (1871), arose from a post-Civil War dispute between pro- and anti-slavery factions of a Kentucky church that was a member of the Presbyterian Church of the United States. The pro-slavery group, which was the minority faction, claimed title to the church property based on the fact that its views were more consistent with the teachings of the Presbyterian Church at the time of the Kentucky church's founding. The Presbytery of Louisville, the next highest governing church body after the church itself, declared the pro-slavery minority the true church body and, therefore, rightful titleholder. The General Assembly, however, the highest governing body in the Presbyterian Church, decided in favor of the majority abolitionist faction instead.

The Watson Court, following the General Assembly's result, ruled in the abolitionist group's favor, and in the process established the following principles: federal courts are competent to enforce express terms contained in trust instruments governing the use or ownership of property. 80 U.S. at 723-24. However, courts may not resolve nor inquire into matters of religious doctrine in order to determine entitlements to property. Id. at 725, 727-29. Where a dispute arises between factions of an independent congregation, "the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations;" if the church had always governed itself by majority rule, for example, the majority faction would prevail. Id. at 725. Finally, where the dispute is between subordinate and superior bodies of a

single hierarchical church organization, and

> whenever the questions of discipline or of
> faith, or ecclesiastical rule, custom or law
> have been decided by the highest of these
> church judicatories to which the matter has
> been carried, the legal tribunals must accept
> such decisions as final, and as binding on
> them, in their application to the case before
> them.

Id. at 727.

The Watson approach is popularly termed the "deference" approach, and requires judicial recognition of the decisions of a hierarchical church's highest body on matters of discipline, faith or ecclesiastical rule, custom or law.  Although Watson was decided before the Fourteenth Amendment was interpreted to render the First Amendment applicable to the states, and therefore cannot strictly be termed a "constitutional" interpretation, later Supreme Court opinions have recognized its holding as grounded in concerns of constitutional dimension.  See, e.g., Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116 (1952).

The Watson rule of deference was further defined in Gonzalez v. Roman Catholic Archbishop, 280 U.S. 1 (1929), a case in which a layman sued the Archbishop, claiming a right to be appointed to a chaplaincy and to receive a concomitant income according to the terms of a trust created 100 years earlier by an ancestor.  The Archbishop had refused to appoint the plaintiff on the ground that he did not meet the qualifications for a chaplain specified by the 1918 Code of Canon Law.  The Supreme Court rejected the Archbishop's contention that secular courts lacked any jurisdiction over the case because of the ecclesiastical nature of the dispute, holding instead that there was subject matter jurisdiction because the suit involved an attempt to enforce the terms of a trust.  Id. at 16.  Nonetheless, the Court deferred to the Archbishop's decision to deny the petitioner the chaplaincy, holding:

> Because the appointment is a canonical act,
> it is the function of the church authorities
> to determine what the essential
> qualifications of a chaplain are and whether
> the candidate possesses them.  In the absence
> of fraud, collusion, or arbitrariness, the
> decisions of the proper church tribunals on
> matters purely ecclesiastical, although
> affecting civil rights, are accepted in
> litigation before the secular courts as
> conclusive, because the parties in interest
> made them so by contract or otherwise.

Id. at 16 (emphasis added) (footnote omitted).  Thus, while Watson directed blanket judicial deference to determinations of a church's highest body in ecclesiastical matters, dictum in Gonzalez suggested there could be some judicial review of church

decisions in those exceptional cases in which "fraud, collusion, or arbitrariness" was alleged.

The next case, Kedroff v. Saint Nicholas Cathedral, 344 U.S. 94 (1952), involved a dispute over use and occupancy of the Russian Orthodox cathedral in New York between Archbishop Leonty, elected to preside over all Russian Orthodox churches in America by the local churches themselves, and Archbishop Fedchenkoff, appointed to preside over the same churches by the Supreme Church Authority in Moscow. The decision as to the rightful occupant turned on which of the two had been validly selected as ruling hierarch for the American churches. The Supreme Court ruled in Fedchenkoff's favor, stating that matters of "ecclesiastical government" were among those "questions" marked by Watson as out-of-bounds for civil adjudication, id. at 115, and noting that "[e]ven in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls," id. at 120-21 (footnote omitted).

The Court's subsequent opinion in Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440 (1969), is of particular significance to the issue before us. That case involved the decision of two Presbyterian churches in Georgia to withdraw from the national Presbyterian Church in the United States because of the latter's progressive tendencies (ordination of women, church pronouncements on political issues, etc.). The general church acknowledged their withdrawal and attempted to reabsorb the local church properties. The local churches responded with lawsuits in state court.

Holding that Georgia law implied a trust of local church property for the benefit of the general church so long as the general church adhered to the same "tenets of faith and practice existing at the time of affiliation by the local churches," the state trial court presented the case to a jury, which was instructed to determine whether the general church's actions constituted a "substantial abandonment" of its "original tenets and doctrines." Id. at 443. The jury found in favor of the local churches, and the Supreme Court of Georgia affirmed.

The Supreme Court of the United States overturned the decision, explaining that

> [i]t is obvious . . . that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil

> courts of controversies over religious
> doctrine and practice.

393 U.S. at 449 (emphasis added).

Thus, as an alternative to the Watson/Gonzalezdeference approach where the courts would be "engaging in the narrowest kind of review of a specific church decision [to determine] whether [the decision] resulted from fraud, collusion, or arbitrariness," id. at 451, the Presbyterian Church Court suggested that the Georgia courts could apply "neutral principles" of secular property law to resolve intrachurch disputes.

One year later, in Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367 (1970), the Supreme Court upheld a state court's application of this "neutral-principles" approach in a three-sentence per curiam opinion. The case involved an intrachurch property dispute between the General Eldership of the church and two secessionist congregations. Citing the Maryland appeals court's reliance "upon provisions of state statutory law governing the holding of property by religious corporations, upon language in the deeds conveying the properties in question to the local church corporations, upon the terms of the charters of the corporations, and upon provisions in the constitution of the General Eldership pertinent to the ownership and control of church property," the Court concluded that "resolution of the dispute involved no inquiry into religious doctrine" and therefore did not violate the First Amendment. Id. at 367-68.

Justice Brennan, apparently intent on providing state courts with some explanatory guidance, filed a concurring opinion, outlining the acceptable approaches to intrachurch disputes: "[A] State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." Id. at 368 (Brennan, J., concurring) (emphasis in original).

Justice Brennan identified and contrasted the deference approach and the neutral-principles approach. A state may adopt the deference approach taken in Watson and "enforce the property decisions" made within a church of congregational or hierarchical polity unless "'express' terms in the 'instrument by which the property is held' condition the property's use or control in a specified manner." Id. at 368-69 (quoting Watson, 80 U.S. at 722). The latter instance would be appropriate for application of the neutral-principles approach in intrachurch disputes. Citing Presbyterian Church, Justice Brennan stated: "'[N]eutral principles of law, developed for use in all property disputes,' provide another means for resolving litigation over religious property. Under the 'formal title' doctrine, civil courts can determine ownership by studying deeds, reverter clauses, and general state corporation laws." Id. at 370. He cautioned, however, that "general principles of property law may not be relied upon if their application requires civil courts to resolve doctrinal issues. For example, provisions in deeds or in a

denomination's constitution for the reversion of local church property to the general church, if conditioned upon a finding of departure from doctrine, could not be civilly enforced."  Id.(emphasis added) (footnote omitted).

The dispute in Serbian Eastern Orthodox Diocese for the United States and Canada v. Milivojevich, 426 U.S. 696 (1976), the next case in the series, was over control of the Serbian Eastern Orthodox American-Canadian Diocese, its property and its assets.  In response to complaints about the Diocese's Bishop, Bishop Dionisije, the central church removed him as Bishop and reorganized the American-Canadian Diocese into three new dioceses.  The Diocesan National Assembly subsequently repudiated the central church's actions and declared the Diocese completely autonomous.  Bishop Dionisije filed suit in state court seeking injunctive and declaratory relief.

The Illinois Supreme Court entered judgment that invalidated Bishop Dionisije's removal as "arbitrary" because the removal proceedings were not conducted according to the court's interpretation of the Church's constitution and penal code and voided the Diocesan reorganization as beyond the scope of the central church's authority.  Id. at 708.  The United States Supreme Court overturned both parts of the judgment, and explained:

> The fallacy fatal to the judgment . . . is
> that it rests upon an impermissible rejection
> of the decisions of the highest
> ecclesiastical tribunals of this hierarchical
> church upon the issues in dispute, and
> impermissibly substitutes its own inquiry
> into church polity and resolutions based
> thereon of those disputes.

Id.

The Court declared that "where resolution of the disputes cannot be made without extensive inquiry . . . into religious law and polity," courts must accept the applicable decision of the highest church body in a hierarchical church as binding.  Id. at 709.  The Court noted (1) that the First Amendment's command that civil courts refrain from resolving controversies over religious doctrine "applie[d] with equal force to church disputes over church polity and church administration," id. at 710, (2) that, Gonzalez notwithstanding, no "arbitrariness" exception existed "in the sense of an inquiry whether the decision of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations," id. at 713, (3) that the court's evaluation of conflicting testimony concerning internal church procedures and rejection of the highest church body's interpretations were particularly inappropriate, id. at 718-19, (4) that reliance on "neutral principles" could not justify a court's substitution of its own interpretation of church rules for that of the church's highest body, id. at 721, and (5) that the church constitutional provisions at issue "were not so express that the civil courts could enforce them without engaging in a searching and therefore

impermissible inquiry into church polity," id. at 723.

The final case in the series, Jones v. Wolf, 443 U.S. 595 (1979), gives shape to the proper modern judicial approach to intrachurch disputes. Jones arose from a dispute between two factions of a Presbyterian church congregation in Macon, Georgia over possession and use of the church property. The church had always been a member of the Presbyterian Church in the United States ("PCUS"), but a majority of the congregation voted to disassociate the church from the PCUS and join the Presbyterian Church in America. The Augusta-Macon Presbytery, the next highest body in the PCUS hierarchy after the congregation itself, appointed a commission to investigate and it ruled the minority faction constituted the "true congregation." So armed, the minority faction sued in state court for exclusive possession and use of the church property.

Georgia's courts had adopted the neutral-principles approach to resolve intrachurch property disputes and, purporting to apply them, the trial court reasoned that because the deed conveyed the property to the local church, and neither state law, the corporate charter of the local church, nor the constitution of the general church created any trust in favor of the general church, legal title to the property was vested in the local congregation. Then, without further elaboration, the trial court declared the majority faction to be the "true congregation" entitled to possession. The Georgia Supreme Court affirmed.

The United States Supreme Court upheld the Georgia Supreme Court's reliance on the neutral-principles approach and reaffirmed the viability of that approach under the Constitution. The Court stated that "[t]he primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity." Id. at 603. It continued, "[t]he method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." Id.

The Court noted that although the Augusta-Macon Presbytery, the highest church body to decide the question, had declared the minority faction to be the congregation, the Georgia Supreme Court had determined just the opposite. Significantly, notwithstanding Watson's deference approach and the decision in Milivojevich, the Supreme Court did not hold that the result by the Georgia courts could not be sustained. Instead, the Court held that there was no requirement that the Georgia Supreme Court adopt a rule of compulsory deference. Nonetheless, because the basis for the Georgia courts' decision that the majority faction represented the "true congregation" of the local church was unclear and was made without adequate analysis, the Supreme Court remanded for determination by the Georgia courts whether that state had adopted a presumptive rule that a voluntary religious organization is represented by a majority of its members. If so, then the Georgia courts' judgment awarding the property to the majority faction would stand under the neutral-principles

approach. However, the Court cautioned that if Georgia law provided instead that a congregation's identity should be determined according to the rules of the hierarchical parent church, the Georgia courts would owe deference to the Presbytery's determination in favor of the minority faction. Seeid. at 609.

It is evident from the above that before we can apply the instructions learned from the Supreme Court's cases to the issue at hand, we must determine whether the district court correctly ruled that New Jersey has adopted the neutral-principles approach. To do so, we examine the leading cases in that state.

B. New Jersey Law

Subsumed in the Conference's legal argument is its understanding that New Jersey has not adopted the neutral-principles approach. It is certainly true that in Protestant Episcopal Church v. Graves, 417 A.2d 19 (N.J. 1980), cert.denied, 449 U.S. 1131 (1981), the New Jersey Supreme Court reviewed the history and workings of both the deference and neutral-principles approaches and, over a strong dissent that favored the neutral-principles approach, announced:

> In the absence of express trust provisions, we conclude that the hierarchical (Watson) approach should be utilized in church property disputes in this State. Only where no hierarchical control is involved, should the neutral principles of law principle be called into play.

Id. at 24.

In that case, a local Protestant Episcopal church had voted to disaffiliate from the New Jersey Diocese and the larger church organization, and the Diocese sued to restrain the dissenting parishioners from any use of the church property not sanctioned by the Diocese. Although the Conference argues that this case is controlling, it is distinguishable from the Scotts Church dispute in a critical respect. Unlike the present case in which the deed names the local church itself, title to the property at issue in Graves was in the Rector, Wardens and Vestrymen of the local church. Ownership therefore turned on who held those positions, which was a hotly contested subject of dispute between the parties. The Rector had been "ecclesiastically deposed" by the Diocese and the Wardens and Vestrymen had arguably disqualified themselves from holding those offices by disaffiliating from the central church.

This dispute was clearly one of church governance. As the Graves court observed: "The basic dispute herein is unquestionably doctrinal in nature, the ecclesiastical determination of which incidentally affects the control over local church property." Id. (citing Milivojevich, 426 U.S. 696 (1976)). Thus, even under a neutral-principles approach, the court would have had to defer to the resolution of the authoritative ecclesiastical body. See Jones v. Wolf, 443 U.S. at 604 (under neutral principles, where deed incorporates

religious concepts in provisions relating to ownership, and interpretation would require court to resolve religious controversy, court must defer to church hierarchy).

The deference rule was summarily applied by the New Jersey court to resolve another intrachurch property dispute between a diocese of the Protestant Episcopal Church and local church officials decided the same day and involving virtually identical facts. See Diocese of Newark v. Burns, 417 A.2d 31, 33 (N.J. 1980) ("All of these contentions as well as the ancillary points raised by defendants have been considered and disposed of in our opinion in Graves. There we approved the hierarchical church approach utilized in Watson v. Jones."), cert. denied, 449 U.S. 1131 (1981). Three years later, when the New Jersey Supreme Court was confronted again with an intrachurch dispute, this time involving employment rather than property in a congregational (non-hierarchical) church, see Chavis v. Rowe, 459 A.2d 674, 678 (N.J. 1983), the court reaffirmed its declaration in Graves that the choice between the Watson or the neutral-principles approach, "depend[s] on the church structure," and held that "New Jersey courts are to use neutral principles in adjudicating property disputes within a congregational church." 459 A.2d at 678.

Were these the only applicable cases considering the issue, we would find problematic the district court's decision here, followed by the magistrate judge, to apply the neutral-principles approach inasmuch as it appears that the AUMP Church is hierarchical. However, the district and magistrate judges relied on the New Jersey Supreme Court's later decision in Elmora Hebrew Center, Inc. v. Fishman, 593 A.2d 725 (N.J. 1991), where the court stated that in resolving intrachurch disputes "a court may, where appropriate, apply neutral principles of law to determine disputed questions that do not implicate religious doctrine." Id. at 730.

The Conference, though conceding that "[it] is not clear what election New Jersey has made between deference and neutral principles," Appellant's brief at 21, argues that because Elmora Hebrew Center involved an employment rather than a property dispute, it is not controlling here and that Graves is authoritative evidence of New Jersey's adoption of the deference rule in church property disputes. It views Graves as the only strictly "authoritative" declaration of the state supreme court because it, like this case, involved a property dispute within a hierarchical church organization whereas the subsequent New Jersey Supreme Court opinions featuring discussion of the deference and neutral-principles approaches, including Elmora Hebrew Center, were rendered in non-property contexts.

However, the Conference offers no principled basis for treating property disputes differently from other types of civil disputes in this regard, nor has the New Jersey Supreme Court suggested that such a distinction is relevant. Rather, that court has indicated, particularly in its most recent opinions on this issue, that the appropriate level of review turns not on the type of civil dispute involved but on the extent to which the dispute implicates questions of religious doctrine or polity.

As a federal court sitting in diversity, we must

predict how the state supreme court would resolve a given dispute where the applicable state law is unclear.  See Clark v. Modern Group Ltd., 9 F.3d 321, 326 (3d Cir. 1993).  In forming that prediction, the federal court "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand."  McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657, 663 (3d Cir.), cert. denied, 449 U.S. 976 (1980).

We have recognized, along with respected commentators, that "[c]onsidered dicta by the state's highest court may provide a federal court with reliable indicia of how the state tribunal might rule on a particular question," and be considered "'conclusive,'" particularly if it is "'a carefully considered statement by the state court.'"  Id. at 662 & n.21 (quoting C. Wright, Law of Federal Courts, § 58, at 270 (3d ed. 1976)).

We have even stated that "a federal court sitting in diversity may diverge from existing precedent when there is sufficient evidence that the highest state court would be willing to entertain a change in its common law."  W.A. Wright, Inc. v. KDI Sylvan Pools, Inc., 746 F.2d 215, 218 (3d Cir. 1984); seealso Becker v. Interstate Properties, 569 F.2d 1203, 1206 (3d Cir. 1977) ("[A] federal court must be sensitive to the doctrinal trends of the state whose law it applies.").  "[R]elevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince."  McKenna, 622 F.2d at 662 (quoting 1A Moore's Federal Practice, ¶ 0.307, at 3077 (2d ed. 1979)).

Five recent decisions show the New Jersey courts' movement towards a rule that calls for application of neutral principles regardless of church structure, as long as the dispute does not entangle the court in questions of religious doctrine or governance.  In McElroy v. Guilfoyle, 589 A.2d 1082 (N.J. Super. Ct. Law Div. 1990), a Roman Catholic priest sued the Camden Diocese and two of its bishops, claiming they had breached a promise to pay legal fees the priest incurred in defending against criminal charges.  Despite the clearly hierarchical structure of the Roman Catholic Church, the court applied neutral principles, declaring that

> secular courts may decide civil disputes
> between a religious body and its members or
> its clergy if those disputes involve purely
> secular issues and can be resolved without
> entanglement with matters of faith,
> discipline or doctrine.  In such cases,
> courts are to apply neutral principles of law
> to the facts presented.

Id. at 1083–84 (citation omitted).  As this was not the state's supreme court, the impact of the court's recommendation of neutral-principles analysis would be limited, but for the state supreme court's later acceptance of precisely the same analysis.

A year later in Elmora Hebrew Center, a case involving a suit by a synagogue seeking enforcement of its discharge of a

rabbi, the New Jersey Supreme Court signalled a realignment in support of the neutral-principles approach in property disputes:

> [C]ourts have arrived at several acceptable means for confining their adjudications to the proper civil sphere. Civil courts can accept the authority of a recognized religious body in resolving a particular doctrinal question. In disputes involving a church governed by a hierarchical structure, courts should defer to the result reached by the highest church authority to have considered the religious question at issue. Similarly, in disputes involving a church with a congregational structure, courts should defer to resolutions by a majority (or other appropriate subgroup) of the church's governing body.
>
> Without regard to the governing structure of a particular church, a court may, where appropriate, apply neutral principles of law to determine disputed questions that do not implicate religious doctrine. "Neutral principles" are wholly secular legal rules whose application to religious parties or disputes does not entail theological or doctrinal evaluations.

593 A.2d at 729-30 (emphasis added) (citations omitted).

Thus, in Elmora Hebrew Center the New Jersey Supreme Court appears to have abandoned the bright-line rule formed in Graves and Chavis that the deference approach be applied to disputes in hierarchical churches and the neutral-principles doctrine be applied to disputes in congregational churches. Particularly significant is the New Jersey Supreme Court's statement in Elmora Hebrew Center that "[t]his 'neutral principles' approach is particularly suited to adjudications of property disputes," id. at 730, and that "[t]he application of the 'neutral principles' doctrine presents the potential advantage of permitting parties to assure a consistent approach to questions of property ownership or church membership by inclusion of appropriate terms in deeds, contracts, or by-laws," id. The court's glowing, and certainly gratuitous, commendation of neutral-principles analysis in intrachurch property disputes strongly suggests a willingness to shift accordingly in an appropriate case.

The same indication was given by the state supreme court a year later in a pair of cases decided the same day. In Welter v. Seton Hall University, 608 A.2d 206 (N.J. 1992), former nuns who had been discharged by Seton Hall, a Catholic university, sued, alleging that the University had breached their employment contracts. A court of the state's appellate division had concluded that the dispute was not one for civil adjudication, but the New Jersey Supreme Court reversed. Citing

"Justice Handler's comprehensive opinion" in Elmora Hebrew Center, the New Jersey Supreme Court stated categorically that "[i]n appropriate circumstances a court may apply neutral principles of law to determine disputed questions that do not implicate religious doctrine."  Id. at 212.

The court emphasized that a court's choice between the deference and neutral-principles approaches should turn on whether the dispute implicates questions of religious doctrine or polity.  "Only when the underlying dispute turns on doctrine or polity should courts abdicate their duty to enforce secular rights.  Judicial deference beyond that demarcation would transform our courts into rubber stamps invariably favoring a religious institution's decision regarding even primarily secular disputes."  Id. at 213.

Perhaps alluding to Graves, it further explained:
> This case differs markedly from the vast majority of previous intra-religion cases, which challenged deprivations of a party's status within a religion and which concerned only incidental deprivations of the secular trappings of that former status within the faith.  Just as the existence of a tangential secular issue does not authorize civil courts to override primarily doctrinal determinations by authorities in hierarchial [sic] religions, inconsequential doctrinal issues that were irrelevant to the employment relationship do not preclude doctrinally-objective enforcement of a secular interest pursuant to a secular agreement.

Id. at 217 (emphasis added) (citation omitted).

The other case decided by the New Jersey Supreme Court that day, Alicea v. New Brunswick Theological Seminary, 608 A.2d 218 (N.J. 1992), provided an example of a case in which judicial application of neutral principles was not appropriate.  There a professor brought suit against a seminary alleging breach of an employment promise.  Determining that the professor performed a "ministerial function" and held "doctrinally-sensitive" responsibilities, the court concluded that to interfere in the church's employment decisions regarding such a position would necessarily involve impermissible entanglement in matters of church polity.  Id. at 223-24.  The court cited extensively to its opinions in Elmora Hebrew Center and Welter but made no reference to Graves.

Finally, in Ran-Dav's County Kosher, Inc. v. State, 608 A.2d 1353 (N.J. 1992), cert. denied, 507 U.S. 952 (1993), the New Jersey Supreme Court's opinion reinforced limitation of the Watson approach to only those property disputes that are doctrinally charged, and affirmatively endorsed the use of neutral-principles analysis in property disputes:

> We recognized in Elmora Hebrew Center that civil courts may resolve controversies involving religious groups if resolution can

                    be achieved by reference to neutral
                    principles of law, but that they may not
                    resolve such controversies if resolution
                    requires the interpretation of religious
                    doctrine.  Neutral principles may be
                    particularly suited for adjudications of
                    property disputes, or civil contract actions,
                    but not where disputes involve
                    interpretations of religious doctrine itself.

Id. at 1363 (citations omitted).

        The New Jersey cases we have examined show a decided
progression of New Jersey court decisions toward adoption of a
neutral-principles approach in resolving intrachurch property
disputes like the one before us.  We thus conclude that the
magistrate judge's application of that approach was not
inconsistent with the law of New Jersey, and therefore not legal
error.  We turn then to examine the Conference's contentions in
light of this legal background.
C. Analysis in Light of "Neutral Principles"
        The Conference contends that its dispute with Scotts
Church is an intrachurch governance dispute, one over church
organization or administration, and not simply one over ownership
of property.  It argues that, therefore, whether the forum state
has adopted the approach requiring deference or neutral
principles, a court is obligated to defer to superior church
authority.
        We reject that argument, as did the trial court,
because it is clear that this dispute is hardly one of
"governance."  Unlike the issue in Kedroff, which entailed a
decision whether the Russian Orthodox Archbishop in America had
been properly selected, or in Milivojevich, which centered on
whether the Serbian Orthodox Bishop in North America had been
properly removed, this case is only incidentally ecclesiastical.
Instead, it consists almost entirely of a raw dispute over
property rights.  In Milivojevich the Supreme Court distinguished
between the two, stating, "this case essentially involves not a
church property dispute, but a religious dispute the resolution
of which under our cases is for ecclesiastical and not civil
tribunals."  426 U.S. at 709.
        The Conference suggests that its decision in April 1991
to require all the congregations to quitclaim their real property
interests was one of governance, but that action was not nearly
as doctrinally charged as that in Jones v. Wolf, 443 U.S. 595
(1975), where the Presbyterian Church declared one faction of a
divided congregation to be the "true" congregation.  Yet even in
Jones, the United States Supreme Court authorized the Georgia
courts to use neutral principles to override the hierarchical
church's determination.
        More importantly, the extent to which a court may
permissibly inquire into disputes of this kind turns on the
specific elements of the inquiry itself and the degree to which
it might trench upon doctrinally sensitive matters, rather than

on conclusory labelling of the whole dispute as either "secular" or "ecclesiastical." Examination of the trial court's determinations here shows that most of them were unquestionably free of doctrinal relevance. The trial court's finding that the phrase in Scotts Church's certificate of incorporation, "to hold same in trust for the uses and purposes of said Church Body," referred to Scotts Church was based principally on the absence of any mention of the Conference in the certificate's text, and the reappearance of the phrase "said Church Body" in the same certificate's two-thirds vote and members-in-good-standing provisions. Neither consideration implicates "questions of religious doctrine, polity, [or] practice." Jones, 443 U.S. at 603.

The trial court used similar legal analysis of language in rejecting the Signature Resolution as a basis for the quitclaim deed's validity, noting that its text had nothing to say about property transfers. In doing so, the court accepted the representations of Conference officials regarding the Resolution's limited effect. Neither of these passive inferences was anything more than the neutral, fact-driven conclusion that every conventional property or contract suit demands.

Although some aspects of the trial court's opinion -- interpreting provisions of the Book of Discipline, for example -- may have touched on the church-governance sphere, they were irrelevant to the ultimate determination. The trial court's alternative ground for decision, its application of the state-law conflict rule, was free of doctrinal implications and provides an adequate basis for affirmance.

The trial court determined that even if the terms of the Book of Discipline, including the Property Resolution, were assumed effective and binding on Scotts Church, they simply functioned as Scotts Church's corporate bylaws. See N.J. Stat. Ann. § 15A:1-2(c) ("'Bylaws' means the code of rules adopted for the regulation or management of the affairs of the corporation irrespective of the name by which these rules are designated[.]"). Indeed, the Conference itself described the Book of Discipline as "bylaws" at oral argument. Because those terms conflicted with Scotts Church's certificate of incorporation, which requires a two-thirds vote by church members before any property is transferred, and because New Jersey law states that in such conflicts the certificate prevails, it followed that the two-thirds vote requirement had not been overridden, and no property transfer had been effected. See App. at 38-39. Since the Signature Resolution was an amendment to the Book of Discipline and the secession clause was one of its original provisions, they are also by-laws which under New Jersey law cannot override Scotts Church's certificate of incorporation.

The trial court's application of the conflict rule was consistent with the well-established rule in New Jersey that provisions of a corporation's charter or articles of incorporation enjoy priority over contradictory or inconsistent by-laws. See Leeds v. Harrison, 87 A.2d 713, 717-18, 720 (N.J. 1952) (religious nonprofit corporation may adopt by-laws only "if conformable and subordinate to" corporation's charter);

L.L. Constantin & Co. v. R.P. Holding Corp., 153 A.2d 378, 383 (N.J. Super. Ct. Ch. Div. 1959) ("[W]here inconsistency exists between by-laws and certificate of incorporation, the latter ordinarily governs . . . ."); see also Elkins v. Camden & Atlantic Railroad Co., 36 N.J. Eq. 467, 468-69 (N.J. Ch. 1883); Kearney v. Andrews, 10 N.J. Eq. 70, 72-74 (N.J. Ch. 1854); Model Business Corporation Act Annotated § 2.06(c) (3d ed. 1993); 18 C.J.S. Corporations §§ 112(a), 114(a), 115(d) (1990); 18A Am. Jur. 2d Corporations §§ 313, 314 (1985 & Supp. 1996).

 The trial court's holding was also consistent with the Delaware Court of Chancery's resolution of a case nearly identical to this one filed against the Conference by a local Delaware AUFCMP church that involved a quitclaim deed signed at the same April 6, 1991 meeting at issue here. See Mother AUFCMP Church v. Conference of AUFCMP Church, No. 12055, 1991 WL 85846 (Del. Ch. May 16, 1991). As in this case the Conference defended the validity of the quitclaim deed by reference to the Property and Signature Resolutions and, as in this case, the local church's certificate of incorporation pre-dated the incorporation of the Conference in 1941 and specified that property could not be transferred without the consent of two-thirds of the members of the local church. The court's language in that decision could apply equally to Scotts Church:

> [B]y the defendants' own characterization, those documents [the Property and Signature Resolutions] occupy, at best, the status of by-laws of the [local church]. Assuming without deciding the validity of that characterization, the January 12th "by-law" placing local church properties "in trust" for the Conference runs afoul of the principle that where a by-law conflicts with the provisions of the charter, the by-law is a nullity.

Id. at *8; see also St. Thomas AUMP Church v. Conference of AUFCMP Church, No. 13006-NC, 1995 WL 694390 (Del. Ch. Nov. 6, 1995) (applying collateral estoppel to the Conference's claims based on the adverse decision Mother AUFCMP Church).

 Thus, even if the Conference's claims regarding its Property Resolution, Signature Resolution, and secession clause are given full weight, under basic, well-established principles of state law, they cannot override the certificate of incorporation's two-thirds vote requirement. Application of this neutral rule of priority effectively disposes of the Conference's principal contentions without engagement of any ecclesiastically sensitive issues. Significantly, the Conference has not mentioned -- let alone challenged -- this independent basis for the trial court's decision.

 The Conference's remaining arguments are decidedly less compelling, and we discuss each of them only briefly.

 The Conference devotes much of its briefs to its contention that the magistrate judge erred in rejecting its claim that it is the legal successor to the 1813 "Union Church of

Africans," arguing that the judge erroneously failed to admit evidence proving that fact and that these errors "caused most of its other errors." See Brief of Appellant at 14-16. Paradoxically, at oral argument, it conceded that this issue is "not important." In any event, the argument is inconsequential. Even if the Conference were assumed to be successor to the Union Church, that at most suggests that the term "said Church Body" in Scotts Church's 1915 certificate of incorporation could have referred to a denominational church already extant at that time. The magistrate judge, however, concluded that "said Church Body" referred to Scotts Church itself, and did so on the independent ground that the portion of the certificate of incorporation requiring "a vote of two thirds of the members of said Church Body, who shall have been members in good standing in said Church Body" was a clear indication that "said Church Body" was the Scotts Church congregation proper, not the entire AUMP hierarchy. See App. at 16-17.

　　　　The Conference also argues that the trial court erred in determining that the Conference had not contributed any of the money paid for the Baird Boulevard property. That is a factual finding that is not clearly erroneous. In any event, absent either an indication that any controlling terms in the relevant instruments tied property entitlement to actual expenditure or some request for equitable intervention, the source of the purchase price is irrelevant. To the extent the decision by the trial court turned on its findings of fact, we conclude that none of the dispositive findings is clearly erroneous. See Fed. R. Civ. P. 52(a).

III.

Conclusion

　　　　To summarize, we view as correct the district court's determination that a neutral-principles approach may be applied in New Jersey to resolve hierarchical intrachurch property disputes. We additionally find no error in the magistrate judge's application of neutral-principles analysis and resulting substantive determinations that the April 6, 1991 quitclaim deed is invalid and that Scotts Church remains the valid titleholder to its Baird Boulevard property. We will therefore affirm the judgment of the district court.


TO THE CLERK:

　　　　Please file the foregoing opinion.




　　　　　　　　　　　　　　　　　　Chief Judge